**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Bernardo Moreno DAVILA,
Defendant-Appellant.**

No. 77–5427.

United States Court of Appeals,
Fifth Circuit.

April 10, 1979.

Rehearing and Rehearing En Banc
Denied May 24, 1979.

Roy R. Barrera, Terrence McDonald, San Antonio, Tex., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, W. Ray Jahn, James W. Kerr, Jr., Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before COLEMAN, GEE and HILL, Circuit Judges.

GEE, Circuit Judge:

Davila was convicted of violating 18 U.S.C. § 1343, by using interstate telegraphic wire services in a scheme to defraud. The statute reads:

> Fraud by wire, . . . Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Davila had a produce business in the San Antonio Produce Terminal. One Tarasuk (an unindicted co-conspirator) ran a financial enterprise in the same building and acted as a contract agent for Western Union. As a part of his business Tarasuk wired money; under Western Union rules he was to require prepayment before doing so, but there was a chink in the regulation: Western Union allowed him a week to ten days grace to remit. Tarasuk took advantage of this by "lending" Western Union funds over short periods to his customers, wiring money and money orders without prepayment so long as they paid him within the seven- to ten-day grace period and pocketing a fee for this ingenious little service.

Defendant Davila began to avail himself largely of Tarasuk's service when, in the fall of 1973, he set about to expand his produce business in the Rio Grande Valley. He needed a line of credit, and in order to get it he asked Tarasuk to wire money

orders to him. The amounts grew from $3,500 in October of 1973 up to as high as $152,000 in April 1974. Some money orders were wired to other names—his employees and family members, including his wife, using both her married and maiden names—but all the money wound up with Davila. As these amounts grew Tarasuk experienced difficulty in repaying Western Union on time. To cope with this problem, Davila set up a bank account in the Valley town of McAllen; he began to deposit some of the wired money orders with the McAllen bank as soon as he received them, asking the McAllen bank to make a bank-to-bank wire transfer to Tarasuk's San Antonio account. The purpose of this maneuver was apparently a classic "kite": retiring prior "loans" with new Western Union funds. In due course the scheme ended, leaving Western Union short almost $68,-000.

For purposes of this trial the government selected a period between April and May 1974, alleging that fifty money orders were wired by Tarasuk to the defendant in interstate commerce pursuant to a scheme to defraud Western Union. The facts were largely uncontested, and the defendant was convicted on all fifty counts, receiving concurrent sentences. The "interstate" portion of the wiring operation is the curious feature of this case: all Western Union wire money transfers are routed through Middletown, Virginia, so that the wires travelled thousands of miles interstate, from San Antonio to Middletown to McAllen, though the two Texas cities are less than three hundred miles apart on a direct line lying entirely within Texas.

### Was There Sufficient Evidence of a Scheme to Defraud?

■ Davila contends that the evidence was insufficient to show a scheme to defraud. He argues that, according to Tarasuk's testimony, Tarasuk himself did not intend to defraud Western Union. Davila testified that he did not know the funds were from Western Union, that he did not know why Tarasuk kept sending him mon-

ey, and that he kept sending the funds back because they were unsolicited. Clearly the jury could have disbelieved this unlikely testimony and inferred a scheme to defraud from the record evidence of (1) Davila's knowledge of Western Union regulations; (2) his kiting scheme established to repay prior loans; and (3) his receipt of money wired in the names of third persons. For good measure, the record includes further evidence that the defendant paid Tarasuk for the "loans" of Western Union funds and that before the defendant and Tarasuk set up the money-wiring operation Western Union had cancelled Davila's line of credit when he failed to repay wired money within a day. This evidence, viewed in the light most favorable to the government, clearly supports the inference that Davila had devised a scheme to defraud Western Union.

Davila also argues that Western Union was not defrauded because it knew of the scheme. He points out that Tarasuk's "loan" practices were long established and were patronized by many customers. The Western Union regulations, however, do require prepayment; and even if Western Union acquiesced in prior arrangements of small "loans," there is no reason to think that it knew of or acquiesced in this large-scale operation—especially when it progressed to the "kiting" stage.

### Was the Defendant's Use of Wired Money Orders Interstate Commerce Within the Scope of the Act?

■ A more unusual question is posed by Davila's contention that the statute was not meant to cover wires sent from point to point within a single state, saying that the routing through Virginia was purely incidental and that the interstate character of the transfers was not essential to the scheme. He cites *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); and *United States v. LaFerriere*, 546 F.2d 182 (5th Cir. 1977), three mail fraud cases, each involving the use of the mails *after* consummation of a fraud. Each of these cases ruled that

such an after-the-fact use of the mails did not fall within the mail fraud statute because it was not made in execution of the fraudulent scheme.[1] Davila argues that, by a parity of reasoning, sending the wire messages in question *interstate* did not assist his scheme (presumably since an intrastate transmission would have done as well) and that, like the packing slips in *United States v. Tarnopol*, 561 F.2d 466 (3d Cir. 1977), these transmissions were too minimal and incidental an interstate involvement to satisfy the jurisdictional requirement of interstate fraud. It will not do.

For the after-the-fact mailings in the cases cited were outside the frauds there in question entirely, came after they had been brought off, and did nothing to further their accomplishment. And the court in *Tarnopol* noted that the mailing of the packing slips there in question, so far from furthering that scheme, provided a record of the fraudulent sales sought to be concealed and "tended to threaten the success of the fraudulent scheme rather than to further it." 561 F.2d at 473. In sum, these cases hold no more than that where the interstate involvement is not in furtherance of the scheme but aside from it, a prosecution will not lie.

No such thing can be said of the interstate messages in this case. To be sure, it was not interstate transmissions (or any other kind) that Davila sought, but rather the delay—triggered by the messages—that Tarasuk's practices permitted while Western Union's money was in Davila's hands. But it was the very transmissions which Davila would brush aside as incidental that placed the money in his hands to hold during Tarasuk's forbearance, and these trans-

missions were of necessity interstate—Tarasuk furnished no comparable intrastate service. Thus, at the heart of Davila's scheme lie interstate transmissions; they were the very key that opened the Western Union cash box to him. A safecracker might with equal want of cogency argue that he was not chargeable with using explosives illegally since what he really wanted was not dynamite but only money. These same observations dispose of Davila's argument that the wires in question were features of his scheme too minimal and incidental to satisfy jurisdictional demands.[2] They were not incidental; they were essential, and they went of necessity on interstate facilities.

AFFIRMED.

---

1. Davila also cites *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), holding that use of the mails to collect school taxes did not violate the mail fraud statute even though some of those who caused the mailings planned to steal some portion of the receipts after they came in. The mailings in question were entirely legal, indeed required by state law; and the amounts claimed in them were not improperly inflated. Thus, the mailings were not part of the plot, being themselves perfectly proper and as appropriate to lawful

collections as to any scheme to misappropriate moneys after or as collected.

2. Davila does not attack the statute on due process grounds or contend that a want of knowledge on his part that the messages went interstate places him outside it, and we leave such questions for another day. *But cf. United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); and *Bibbins v. United States*, 400 F.2d 544 (9th Cir. 1968), and cases there cited.