[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 18, 2005
THOMAS K. KAHN
CLERK

_____

No. 02-12924

_____

D. C. Docket No. 01-00028-CR-01-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CARL M. DRURY, JR., M.D.,
Doctor,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(January 18, 2005)**

Before BARKETT, MARCUS and ALARCÓN[*], Circuit Judges.

MARCUS, Circuit Judge:

_____

[*]Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by
designation.

This case comes before us for a second time after this Court, sitting en banc, vacated an earlier opinion of this panel, United States v. Drury, 344 F.3d 1089 (11th Cir. 2003), and granted rehearing en banc, see United States v. Drury, 358 F.3d 1280 (11th Cir. 2004), and then subsequently vacated the grant of en banc rehearing in light of a congressional amendment to the statute at issue in the case, remanding the matter to this panel for further consideration.  See United States v. Drury, ___ F.3d ___ (11th Cir. 2004).

Drury appeals his convictions for violating the federal murder-for-hire statute, 18 U.S.C. § 1958, and for possessing a firearm in connection with a crime of violence, in violation of 18 U.S.C. § 924(c).  Drury contends that the jurisdictional element of § 1958(a) is properly interpreted as requiring the government to prove that he used the telephone in interstate commerce to commit murder-for-hire, and that it failed to do so at trial.  In addition, Drury argues that the trial court committed reversible error by (1) instructing the jury that a pay phone or a cellular phone is a "facility in interstate commerce" as a matter of law; (2) denying him the opportunity to introduce evidence of his character for truthfulness; (3) excluding testimony from his son regarding a prior consistent statement Drury allegedly made after his arrest; and (4) declining to give two jury instructions he requested.

2

After thorough review, we conclude that the evidence presented was sufficient to establish the jurisdictional element of § 1958(a) under any reading of that provision and, therefore, we need not determine whether Drury's interpretation is correct. Moreover, we hold that the district court committed no reversible error as to its evidentiary rulings or its jury instructions. Accordingly, we AFFIRM.

## I.

## A.

Dr. Drury's scheme to procure the murder of his wife, Mary Drury, was apparently set into motion when Drury invited his friend Steven Whatley to stay in his home after Whatley separated from his wife in March 2001. Whatley, an Agent of the Bureau of Alcohol, Tobacco, and Firearms ("ATF") in Brunswick, Georgia, resided with Drury intermittently for several months. During this time, Drury complained bitterly and frequently about his wife, telling Whatley that he needed "some relief" from her, and that "she needed to go." Drury eventually made his purpose clear, telling Whatley that "Mary has got to die" and "Mary has got to go," and insisting that "it had to look like an accident." Ultimately, Drury asked Whatley if he would kill Mary Drury or find someone else to do so.

Whatley reported this conversation to his supervisor at the Federal Law Enforcement Training Center, who put Whatley in touch with ATF Agents John Limbach and Louis Valoze. The agents provided Whatley with Valoze's undercover cellular telephone number, and instructed him to give Drury the number if he approached Whatley again about murdering his wife. When Drury did so, Whatley gave him Agent Valoze's phone number, with its local South Georgia area code.

Drury placed a total of four calls to Agent Valoze's cellular phone. All four were made from pay phones in Brunswick, Georgia, and both Drury and Valoze were physically located within the state of Georgia at all times during the four telephone conversations. Drury first called Agent Valoze on August 7, 2001, and arranged to meet him at a local restaurant the next day. At that meeting, Drury formulated a plan with Valoze to procure the murder of Mary Drury. Valoze told Drury that he required a gun and a fee of $2,000. Drury provided Valoze with detailed information about his wife and her habits, including her place of employment, her work schedule, and the type of car she drove. Drury stressed that "[i]t just needs to be an accident." He told Valoze that he would call him again in a few days.

Drury placed his second call to Valoze's cellular phone on August 9, 2001. During this conversation, Drury provided Valoze with Mary Drury's license plate number. Drury also negotiated the fee for the murder down to $750.

On August 15, 2001, Drury placed a third call to Agent Valoze's cellular phone. He arranged to meet Valoze at 9:00 p.m. on August 20, 2001, outside a restaurant in Darien, Georgia. At that meeting, Drury provided Valoze with an unloaded .38 caliber handgun and -- after further negotiating the fee -- $250 as payment for the murder. Drury told Valoze that he wanted to wait to see if his wife would sign their divorce papers, and if so, he wanted Valoze only "to follow her" to find out whether she was seeing another man. If she refused to sign the papers, Drury said, "we'll go ahead." Drury and the putative hit-man agreed to speak again at the end of the week.

Drury place his fourth and final call to Agent Valoze's cellular phone on August 24, 2001. During this call, Drury informed Valoze that his wife had not signed the papers, and that Valoze should proceed with the murder as planned. Drury advised Valoze that his wife was driving back from her sister's home in northern Georgia, and that he "could . . . catch her on the way back, it'll be a good, good time." Drury told Valoze, "you the man," to which Valoze responded, "all

5

right Doc I'm gonna do this thing." Following this final conversation, ATF agents arrested Drury.

At Drury's trial, the government introduced evidence regarding the paths traveled by the telephone signals that facilitated the calls between Drury and Agent Valoze. A representative of BellSouth Telecommunications, the company that serviced the pay phones Drury used to contact Valoze, testified that all calls from the telephones Drury used are routed to a switching center in Brunswick, Georgia, from where they are routed to their intended destination, whether local, interstate, or international. The signal from a purely local call would not leave Georgia, but in the case of a call to a cellular phone, it might. A representative of VoiceStream Wireless, the company that serviced Agent Valoze's cellular phone, then testified that Drury's calls to Valoze's phone all traveled through a VoiceStream switching center in Jacksonville, Florida, before being routed back to Agent Valoze's cellular phone in Georgia.

Drury's basic defense at trial was that the whole murder-for-hire scheme was merely an ATF role-playing exercise. He testified that he never spoke to Whatley about killing his wife, but merely about his concern that she was having an affair and his desire to hire a private investigator. Drury claimed that Whatley then informed him that Drury could participate in an ATF training program,

6

whereby he would pretend to seek a murder-for-hire, and ATF agents would place Mary Drury under surveillance and provide Drury with a detailed written report of their findings. Drury denied ever actually intending to have his wife killed, and stated that his $250 payment to Agent Valoze was simply reimbursement for the surveillance.

To support his role-playing explanation, Drury noted that the purported "trigger" for proceeding with the murder of Mary Drury -- her refusal to sign divorce papers -- was, in fact, a falsification; the couple had no plans to divorce. Mrs. Drury's testimony at trial corroborated her husband's claim that the couple had never discussed divorce. Whatley, in his trial testimony, denied ever discussing or engaging in role play with Drury. Drury, in turn, called two character witnesses, Ted Turner and Joseph Bridgers, who attested to Whatley's reputation for untruthfulness.

Drury also attempted to introduce his son Don's testimony that Drury had told him about the role-playing exercise while sitting in a police vehicle shortly after his arrest. The government objected, arguing that the testimony was inadmissible because Drury had a motive to fabricate the story after his arrest, since he had not told anyone about the role play beforehand. The district court excluded Don's testimony.

Drury also sought to introduce testimony about his character for truthfulness, under Federal Rule of Evidence 608. The government objected, arguing that Rule 608 was inapplicable since it had questioned only Drury's credibility generally, not his character for truthfulness. The district court ruled the testimony inadmissible.

In addition, Drury submitted, prior to trial, two proposed jury instructions -- one pertaining to the reliability of government investigations, and the other to witness' reputations for truthfulness. The trial court gave neither of the requested instructions. However, the trial court provided the jury with its own instructions on witness credibility, both before and after trial. The trial court also instructed the jury that "pay phones and cellular phones are 'facilities in interstate commerce' under federal law." Drury objected to this charge and to the district court's refusal to give his requested instructions.

B.

A jury convicted Drury of plotting a murder-for-hire in violation of Title 18 U.S.C. § 1958, and of the related offense of possessing a firearm in connection with a crime of violence, in violation of 18 U.S.C. § 924(c). At the time of Drury's conviction, § 1958 provided:

§ 1958.  Use of interstate commerce facilities in the commission of murder-for-hire

(a) Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

(b) As used in this section and section 1959--

(1) "anything of pecuniary value" means anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage;

(2) "facility of interstate commerce" includes means of transportation and communication; and

(3) "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

18 U.S.C. § 1958 (2000).[1]

---

[1]Section 1958 was originally enacted as part of the Interstate Travel in Aid of Racketeering Statute ("Travel Act"), codified at Title 18 U.S.C. § 1952.  The Travel Act, in its original form, established federal jurisdiction over organized crime and racketeering offenses having a nexus with interstate commerce, but did not specifically include murder-for-hire within its scope.

The original Travel Act, entitled "Interstate and foreign travel or transportation in aid of

The district court sentenced Drury to 204 months' imprisonment. He timely appealed to this Court.

---

racketeering offenses," established penalties for anyone who "travels in interstate or foreign commerce or uses any facility or foreign commerce, including the mail, with intent to (1) distribute the proceeds of any unlawful in interstate activity; or (2) commit any crime of violence to further any unlawful activity." 18 U.S.C. § 1952(a) (1961). The statute provided that "[a]s used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion or bribery in violation of the laws of the State in which committed or of the United States." Id. § 1952(b).

In 1984, as part of the Comprehensive Crime Control Act, Congress amended the Travel Act to include the offense of murder-for-hire. Congress added to the statute § 1952A, whose language was nearly identical to that of the current § 1958.

Section 1952A, as originally enacted, provided:

(a) Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, shall be fined . . . .

(b) As used in this section and section 1952B

(1) "anything of pecuniary value" means anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage; and

(2) "facility of interstate commerce" includes means of transportation and communication.

18 U.S.C. § 1952A (1984).

Several years later, as part of the Anti-Drug Abuse Act of 1988, Congress removed § 1952A from the Travel Act, reenacting it in virtually identical terms as a separate statute, 18 U.S.C. § 1958. Since 1988, Congress has made several slight modifications to § 1958, but the statute before the Court today is substantively the same as the one Congress originally appended to the Travel Act in 1984 and recast in 1988 as § 1958.

10

C.

This panel initially affirmed Drury's convictions. United States v. Drury, 344 F.3d 1089 (11th Cir. 2003). By a divided vote, the panel held that § 1958(a) creates federal jurisdiction only when a murder-for-hire scheme uses in interstate commerce a facility such as the telephone. Id. at 1104. Accordingly, the panel concluded that the district court erred in instructing the jury that pay phones and cellular phones are per se facilities in interstate commerce, but it found this error to be harmless, in light of the evidence that the cellular phone signal actually traveled from Georgia into Florida, before bouncing back into Georgia, each time Drury called Agent Valoze. Id. at 1106. The interstate path of the phone signals, the panel held, constituted sufficient evidence to satisfy § 1958(a)'s jurisdictional nexus, and thus to support Drury's conviction. Id. at 1104-05. The panel also unanimously held that the district court committed no reversible error in prohibiting Drury from introducing evidence of his character for truthfulness, id. at 1110; in refusing to admit testimony from Drury's son regarding a prior consistent statement made by Drury after his arrest, id. at 1108-09; or in denying Drury's request for certain jury instructions regarding witness credibility and law enforcement investigative techniques, id. at 1109-10.

11

On February 3, 2004, this Court vacated the panel opinion and directed that the case be heard en banc. United States v. Drury, 358 F.3d 1280 (11th Cir. 2004) (en banc). We granted rehearing en banc to consider the important question of whether a purely intrastate use of a facility of interstate commerce (the telehphone) satisfies the jurisdictional requirement of § 1958(a).

Notably, after the grant of en banc rehearing, Congress amended § 1958 to resolve precisely that question, which had been the subject of some interpretive disagreement among the courts of appeals. The Sixth Circuit, in United States v. Weathers, 169 F.3d 336 (6th Cir. 1999), interpreted the phrase "[w]hoever . . . uses . . . any facility in interstate . . . commerce" as requiring that the relevant facility actually be used in interstate commerce.[2] In contrast, the Fifth Circuit, in United States v. Marek, 238 F.3d 310 (5th Cir. 2001), interpreted that language as covering any use -- intra- or interstate -- of an interstate commerce facility. The Seventh Circuit, in United States v. Richeson, 338 F.3d 653 (7th Cir. 2003), similarly read § 1958's jurisdictional language as "requir[ing] that the facility, and not its use, be in interstate or foreign commerce." Id. at 660.

---

[2]It bears noting, however, that the Sixth Circuit subsequently disavowed the reasoning of Weathers and limited its holding to the facts of that case, adopting instead the Fifth Circuit's construction of the statute in Marek. See United States v. Cope, 312 F.3d 757, 771 (6th Cir. 2002).

12

The principal source of the courts' interpretive difficulty with § 1958 seemed to be the mismatch between the jurisdictional section's use of the phrase "facility in interstate . . . commerce," see § 1958(a), and the definitional section's use of the similar but not identical phrase "facility of interstate commerce," see § 1958(b)(2) (providing that "'facility of interstate commerce' includes means of transportation and communication"), coupled with the possibility of reading "in interstate . . . commerce" as modifying the immediately preceding noun "facility" or the more remote verb "uses." See, e.g., Weathers, 169 F.3d at 340; Marek, 238 F.3d at 313.

In the time since these cases were decided, and since this panel issued its original opinion in this case, Congress has amended § 1958 to eliminate precisely these problems, making the statute's jurisdictional reach crystal clear. As part of the Intelligence Reform and Terrorism Prevention Act of 2004, which passed the House of Representatives December 7 and the Senate December 8, and was signed into law by the President on December 17, Congress amended 18 U.S.C. § 1958 to change the phrase "facility in" to "facility of." The amendment provides:

Section 1958 of title 18, United States Code, is amended--

>    (1) in subsection (a), by striking "facility in" and inserting "facility of"; and

13

(2) in subsection (b)(2), by inserting "or foreign" after "interstate".

Intelligence Reform and Terrorism Prevention Act of 2004, § 6704, Pub. L. No. 108-458, 118 Stat. 3638.

Thus, the new version of § 1958 reads, "Whoever . . . uses . . . any facility of interstate or foreign commerce . . . ." This amendment makes absolutely clear that § 1958 establishes federal jurisdiction whenever any "facility of interstate commerce" is used in the commission of a murder-for-hire offense, regardless of whether the use is interstate in nature (i.e. the telephone call was between states) or purely intrastate in nature (i.e. the telephone call was made to another telephone within the same state).

Because this amendment obviates for all future convictions under § 1958 the precise question of statutory construction that we granted rehearing en banc to resolve, we determined that the case no longer merited en banc consideration. The full Court thus vacated the order granting rehearing en banc, and referred the case back to this panel for further consideration. United States v. Drury, ___ F.3d ____ (11th Cir. 2004).

The opinion we issue today addresses Drury's challenges to his conviction under the previous version of § 1958 without resolving any broader question of

14

statutory construction, since Drury's own conviction stands under either of the competing interpretations of § 1958(a). On reconsideration, we once again find that the uncontroverted evidence that Drury, in arranging for the murder of his wife, used a telephone on four separate occasions to place calls that actually crossed an interstate border, is sufficient to support his conviction regardless of how we read § 1958(a)'s jurisdictional language. In addition, we again conclude that the district court committed no reversible error in its evidentiary rulings or its instructions to the jury. We therefore AFFIRM Drury's convictions.

## II.

## A.

Drury first argues that the government offered insufficient evidence at trial to establish the he <u>used</u> a facility <u>in interstate commerce</u>, as he alleges is required by § 1958(a). Drury does not dispute the government's expert testimony that each of the four calls he placed to Agent Valoze's cellular phone was routed from Georgia through VoiceStream's Jacksonville, Florida switching center, and then

back into Georgia,[3] but he nevertheless contends that these interstate contacts do not satisfy § 1958(a)'s jurisdictional requirement.

The government argues that § 1958(a) requires only proof that Drury used a facility that, based on its interstate <u>capabilities</u> rather than actual interstate <u>use</u>, qualifies inherently as a "facility in interstate commerce." Alternatively, the government contends that even if the statute requires that a facility actually be <u>used</u> in interstate commerce, the routing of Drury's calls from Georgia through Florida fully satisfies this requirement.

Whether there is sufficient evidence to support a conviction is a question of law, which we review <u>de novo</u>. <u>United States v. Tarkoff</u>, 242 F.3d 991, 993 (11th Cir. 2001). "We will affirm a jury's verdict if a reasonable trier of fact could conclude that the evidence establishes guilt beyond a reasonable doubt. In determining a sufficiency of the evidence claim, we view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." <u>United States v. Miles</u>, 290 F.3d 1341, 1355 (11th Cir. 2002) (citation omitted).

---

[3]Drury does, however, mistakenly refer to the telephone signal as a radio signal. This is incorrect. Prior to reaching the cellular tower closest to the target user's cellular phone, a telephone signal sent from a land line travels entirely through terrestrial means. It is only after that call has been switched by the cellular provider to the cellular tower closest to the target subscriber that the signal passes via radio signals.

In evaluating Drury's sufficiency of the evidence claim, we do not decide whether § 1958(a) actually requires that a facility be used in interstate commerce, since it suffices here to observe that uncontroverted evidence establishes that the relevant facility (the telephone) was so used. Drury argues that the interstate routing of the four telephone calls he placed from Georgia pay phones to Agent Valoze's Georgia cellular phone is inadequate to establish that he used the telephone in interstate commerce, since a "signal sent unintentionally and inadvertently across state lines" is a "tenuous and insufficient" contact. This argument is unpersuasive.

Drury points to nothing in the statute, and we can find nothing that suggests the telephone's use in interstate commerce must be knowing or intentional. We see no reason that unintentional use in interstate commerce would not qualify as use in interstate commerce, and this Circuit's precedent suggests that there is none. In United States v. Davila, 592 F.2d 1261 (5th Cir. 1979),[4] the former Fifth Circuit held that the "purely incidental" interstate routing of a Western Union wire transfer satisfied the interstate commerce requirement of the federal wire fraud statute, 18 U.S.C. § 1843. In Davila, funds transferred between two banks located

---

[4]The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

in the state of Texas were, unbeknownst to the defendant, routed through the state of Virginia. In spite of the fact that the interstate routing was wholly incidental to the wire fraud offenses with which the defendant was charged, the Court rejected the defendant's argument that the interstate nexus was "too minimal and incidental" to satisfy the statute's jurisdictional element, reasoning that the wire transfers "were essential" to carrying out the offenses charged, "and they went of necessity on interstate facilities." Id. at 1264.

The interstate routing of Drury's willful calls to Agent Valoze was similarly necessary for their completion, and the calls themselves were essential in facilitating the murder-for-hire plot. The calls were not accidentally or incidentally placed, but rather were made knowingly to further a scheme to commit murder-for-hire. Accordingly, whether Drury knew or intended that they would travel across state lines is immaterial. This situation is no different than if Agent Valoze had himself been located in Florida when he received Drury's calls to his cellular phone -- Drury might not have had any intention of placing an out-of-state call, but undoubtedly he would have done so.

That Drury did in fact use the telephone in interstate commerce to facilitate murder-for-hire fully establishes the jurisdictional element of § 1958(a). We, therefore, conclude that the government presented sufficient evidence at trial for a

18

reasonable jury to have "found the essential elements of the crime beyond a reasonable doubt," Tarkoff, 242 F.3d at 993, and we reject Drury's sufficiency of the evidence claim.

B.

Drury next argues that, regardless of whether the government presented sufficient evidence to establish the requisite jurisdictional nexus, the district court erred in instructing the jury that "pay telephones and cellular telephones are 'facilities in interstate commerce' under federal law." This instruction, Drury contends, violated his right to have a jury decide whether he "is guilty of every element of the crime with which he is charged, beyond a reasonable doubt," United States v. Gaudin, 515 U.S. 506, 510, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995) (citation omitted), by removing from the jury's consideration an essential element of a § 1958 violation: the interstate nexus.

The propriety of the trial court's jury instruction is a question of law, which we review de novo. United States v. Leonard, 138 F.3d 906, 908 (11th Cir. 1998).

The jurisdictional requirement of § 1958(a) is a substantive element of the offense of murder-for-hire. See United States v. Tinoco, 304 F.3d 1088, 1105 (11th Cir. 2002) (observing that the identically worded jurisdictional requirement of § 1958's predecessor statute, the Travel Act, "is a substantive element of Travel

19

Act offenses that must be decided by a jury"). Drury, therefore, has a constitutional right to have a jury determine whether the requirement is satisfied. See Gaudin, 515 U.S. at 522-23 ("The Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged."); id. at 513 (observing that there is a "historical and constitutionally guaranteed right of criminal defendants to demand that the jury decide guilt or innocence on every issue, which includes application of the law to the facts").

However, we need not decide whether the trial judge's instruction that telephones are "facilities in interstate commerce" violated Drury's right to a jury determination of every element of the charged offense, since the instructions are subject to harmless error review. As the Supreme Court observed in Chapman v. California, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." Plainly, a jury instruction that omits an element of the charged offense -- the error Drury alleges here -- is subject to harmless error analysis. See Neder v. United States, 527 U.S. 1, 9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)

20

("[A]n instruction that omits an element of the offense does not <u>necessarily</u> render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."); <u>Ross v. United States</u>, 289 F.3d 677, 681 (11th Cir. 2002). The appropriate inquiry is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" <u>Neder</u>, 527 U.S. at 15 (quoting <u>Chapman</u>, 386 U.S. at 24).

Here, it is clear beyond reasonable doubt that instructing the jury that telephones are "facilities in commerce" did not contribute to their rendering of a guilty verdict. At trial, the government presented clear and uncontradicted evidence that all four telephone calls Drury placed to Agent Valoze traveled from Georgia into Florida, and then back into Georgia. Drury did not dispute this evidence at trial, nor does he challenge it on appeal. Since the factual foundation for the jurisdictional component of § 1958(a) is uncontested, we cannot conclude that Drury's constitutional rights were impaired by the challenged jury instruction, even if it was improperly given. We have no reasonable doubt that the jury would have reached the same result with or without that instruction, and thus conclude that even if the district court's instruction on § 1958(a)'s jurisdictional element was erroneous, any such error was harmless.

C.

21

Drury next challenges the district court's exclusion of evidence of his truthful character. Drury claims that the government attacked his credibility at trial, entitling him to introduce rehabilitative evidence pursuant to Federal Rule of Evidence 608(a)(2). Rule 608(a)(2) provides that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."

Drury does not suggest that the government presented any opinion or reputation evidence about his character, but argues that his character was "otherwise" attacked. He offers as the basis for this contention a series of scattered questions asked by the prosecutor during cross-examination of Drury.[5] Among the examples of what Drury cites as the prosecution's "credibility-laden questions" are these: "Are you telling us that you told an arresting officer that you wanted to make a statement and he wouldn't let you?"; "Are you saying that he hushed you up?"; "Is that what you want this jury to believe?"; "You don't think the officer had any reason to think that you were trying to offer him a bribe?"; and

---

[5]Drury also contends that the government displayed its intention to attack his character during a sidebar conference with the trial judge, when the prosecutor stated: "This is not a collateral material, he has made character an issue in his defense." Drury takes this statement entirely out of context. In reality, the quoted statement was referring not to Drury's "character for truthfulness," but to the "character of the relationship" between himself and Whatley, as is made clear from the prosecutor's immediately preceding statement, that "this defendant has made it a linchpin of his defense that his relationship with Mr. Whatley was of a particular character."

"Is that what you are telling us?" Based on these and several other remarks of similar tenor, Drury sought to introduce testimony from six witnesses prepared to attest to his truthful character.

We review a trial court's evidentiary rulings for a clear abuse of discretion. Tinoco, 304 F.3d at 1119. "The application of an abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach." United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc). "By definition . . . under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a de novo standard of review. As we have stated previously, the abuse of discretion standard allows 'a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.'" Id. (quoting Rasbury v. I.R.S. (In re Rasbury), 24 F.3d 159, 168 (11th Cir. 1994) (citations and internal quotation marks omitted); see also Kern v. TXO Prod. Corp., 738 F.2d 968, 971 (8th Cir. 1984) ("The very concept of discretion presupposes a zone of choice within which the trial courts may go either way."). "Thus, when employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." Id.

23

Evidentiary errors "do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir. 1990). "The trial judge is given broad discretion in ruling on the admissibility of character testimony." United States v. Solomon, 686 F.2d 863, 874 (11th Cir. 1982).

After careful review of the pertinent exchanges between the government's counsel and Drury, we conclude that the district court did not abuse its discretion in excluding the proffered testimony. As we have previously observed, under Federal Rule of Evidence 608(a)(2), "evidence of a witness' truthful character is admissible only after [his] character for truthfulness has been attacked." United States v. Hilton, 772 F.2d 783, 786 (11th Cir. 1985). An "attack" that consists only of "Government counsel pointing out inconsistencies in testimony and arguing that the accused's testimony is not credible does not constitute an attack on the accused's reputation for truthfulness within the meaning of Rule 608." United States v. Danehy, 680 F.2d 1311, 1314 (11th Cir. 1982). However, that is precisely the sort of "attack" Drury claims the prosecution to have launched during its cross-examination. Because such an attack is insufficient to authorize

24

rehabilitation under Rule 608, we have little trouble concluding that the district court did not abuse its discretion in excluding Drury's proffered reputation-for-truthfulness testimony.

D.

Drury's next challenge is to the trial court's exclusion of testimony concerning a prior consistent statement Drury allegedly made to his son, Don. Drury's son would have testified that Drury told him immediately after his arrest that he had been participating in a role-playing exercise with Agent Valoze. Drury argues that his son's testimony was admissible on two grounds. First, he claims it was admissible to rehabilitate his credibility, which he says the prosecution impeached on cross-examination by insinuating that he had fabricated the role-playing story. Specifically, Drury cites the question, "Is that where you got the idea to claim that you believed this was all role playing?" as a prosecutorial attack on his credibility. Second, Drury argues that his son's testimony is admissible under Federal Rule of Evidence 801(d)(1)(B), as a prior statement "consistent with the declarant's testimony and . . . offered to rebut an express or implied charge

against the declarant of recent fabrication or improper influence or motive." Fed. R. Evid. 801(d)(1)(B). Both arguments are unavailing.[6]

As to Drury's first argument, we find again that his credibility was not attacked. Drury argues that "[a] prior consistent statement may be used for rehabilitation when the statement has a probative force bearing on credibility beyond merely showing repetition." United States v. Pierre, 781 F.2d 329, 333 (2d Cir. 1986). This may well be true, but it does not change the fact that Federal Rule of Evidence 608 permits rehabilitative evidence only when a witness's reputation for truthfulness has actually been attacked. See Fed. R. Evid. 608(a)(2). As we observed previously, the prosecution's questioning the veracity of the accused's testimony and calling attention to inconsistencies therein does not constitute an attack on the accused's reputation for truthfulness permitting rehabilitative testimony. See Danehy, 680 F.2d at 1314. Again, Drury has pointed to nothing but a few cross-examination questions to support his claim that the prosecution attacked his character for truthfulness.

_____

[6]Drury makes the additional claim that the trial court improperly ruled that Federal Rule of Evidence 613 barred Don Drury's testimony. However, Drury has taken the trial court's reference to Rule 613 completely out of context. Rule 613(b) governs admissibility of prior inconsistent statements, see Fed. R. Evid. 613(b), and accordingly the trial court applied it in determining the admissibility of alleged prior inconsistent statements by Mr. Whatley, who served as a trial witness. The trial court did not, however, cite Rule 613 as a ground for excluding Don Drury's testimony, and thus we do not address Appellant Drury's argument that the trial court erroneously applied that rule.

26

Moreover, and perhaps more significant, prior consistent statements are treated as admissible non-hearsay only if they are offered to rebut a specific allegation of recent fabrication, not to rehabilitate credibility that has been generally called into question.  See Tome v. United States, 513 U.S. 150, 157, 115 S. Ct. 696, 130 L. Ed. 2d 574 (1995) ("The Rules do not accord this weighty, nonhearsay status to all prior consistent statements. To the contrary, admissibility under the Rules is confined to those statements offered to rebut a charge of 'recent fabrication or improper influence or motive' . . . ." (quoting Fed. R. Evid. 801(d)(1)(B)).  The Supreme Court has made perfectly clear that "[p]rior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited." Id.  Accordingly, the trial court did not abuse its discretion in ruling Don Drury's testimony inadmissible to rehabilitate Appellant Drury's credibility.

As to Drury's second argument, we find that the trial court committed no abuse of discretion in declining to admit Don Drury's testimony as a prior consistent statement.  "A district court is granted broad discretion in determining the admissibility of a prior consistent statement under Fed. R. Evid. 801(d)(1)(B) and will not be reversed absent a clear showing of abuse of discretion." United States v. Prieto, 232 F.3d 816, 819 (11th Cir. 2000).  Of particular importance

27

here, "whether a witness had a motive to fabricate when a prior consistent statement was made is a factual question properly decided by the district court and subject to reversal only for a clear abuse of discretion." Id. at 822.

A prior consistent statement is admissible only if it was "made before the alleged influence, or motive to fabricate, arose." Tome, 513 U.S. at 158. Drury, however, claims that the district court abused its discretion by applying a "temporal litmus test," under which the fact that Drury's statement to his son was made post-arrest rendered it inadmissible, on the theory that his arrest gave Drury a motive to fabricate. In United States v. Prieto, this Court declined to adopt a "bright line rule that motive to fabricate necessarily and automatically attaches upon arrest." Prieto, 232 F.3d at 822. However, the record does not show that the trial court applied such a rule in this case. In fact, the trial judge excluded the statement because he found that "the conditions established by [United States v. Tome] of admissibility of such a statement have not been established here." Although more specific findings on this subject would have eased our inquiry, the record provides ample support for the trial court's determination that Drury, subsequent to his arrest, had motive and opportunity to fabricate the story he told his son. Accordingly, we hold that the trial court did not abuse its discretion in ruling the statement inadmissible.

28

E.

Drury's final challenge is to the trial court's refusal to give his two requested jury instructions. The first proposed instruction, concerning government investigations, read:

I instruct you that you may consider such evidence, including improper investigative techniques, in evaluating the credibility of the government witnesses. In other words, an investigation that is thorough and conducted in good faith may lead to more credible evidence than an investigation that is incomplete, negligent, or conducted in bad faith. In deciding the credibility of law enforcement witnesses, you may consider whether the investigation was conducted according to proper protocol and was complete.

I further instruct you that if the government improperly, or inadequately investigated one aspect of this case, you may infer that the government inadequately, or improperly investigated other aspects of the case, as well. Based on this inference alone, you may disbelieve certain government witnesses.

Drury's second proposed jury instruction was Eleventh Circuit Pattern Jury Instruction (Criminal Cases), Basic Instruction 6.7, at 30 (West 1997), which reads:

There may also be evidence tending to show that a witness has a bad reputation for truthfulness in the community where the witness resides, or has recently resided; or that others have an unfavorable opinion of the truthfulness of the witness. You may consider those matters also in deciding whether to believe or disbelieve such witness.

The district court did not give either instruction. Instead, as part of its preliminary instructions prior to opening statements, the district court instructed the jury:

> [Y]ou are the only people who can determine the credibility or the believability of the witnesses. You are the sole judges of the credibility of the witnesses and the weight to be accorded to the testimony and the evidence . . . . What you are going to see is that in determining the credibility of the witnesses you will use the same criteria that you use in your daily life. The same things that you use to determine the credibility or the believability of the witnesses, are exactly the same sorts of things that you use in your daily lives when you are trying to decide whether or not you can believe somebody about a very important matter.

At the close of trial, the judge further instructed the jury:

> In deciding whether you believe or do not believe any witness, I suggest that you ask yourself a few questions: Did the witness impress you as one who was telling the truth? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to observe accurately the things he or she testified about? Did the witness appear to understand the questions clearly and answer them directly? Did the witness's testimony differ from other testimony or other evidence?

"Our review of a trial court's jury instructions is limited; if the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instruction. Under this standard, 'we examine

30

whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled.'" United States v. Fulford, 267 F.3d 1241, 1245 (11th Cir. 2001) (citation omitted) (quoting Carter v. DecisionOne Corp., 122 F.3d 997, 1005 (11th Cir. 1997) (citation and internal quotation marks omitted)); see also United States v. Gold, 743 F.2d 800, 819 (11th Cir. 1984) ("[T]he district court has broad discretion in formulating its charge so long as the charge accurately reflects the law and the facts."). "The district court's refusal to give the requested instruction is reversible only if (1) the instruction is substantially correct, (2) the instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense." United States v. De La Mata, 266 F.3d 1275, 1298 (11th Cir. 2001).

We find no error in the district court's decision not to give Drury's requested instructions. Drury's proffered non-pattern jury charge was superfluous, since the trial court's general instructions on evaluating evidence and witness credibility were sufficient to guide the jury in its deliberations. Accordingly, the trial court's failure to give Drury's proposed instruction on the reliability of government investigations did not seriously impair his ability to present an effective defense, and thus we can find no abuse of discretion.

Nor did the district court abuse its discretion in declining to give Eleventh Circuit Pattern Jury Instruction 6.7. Applying the three-part reversibility analysis outlined above, we conclude that this charge is clearly "substantially correct" under the first prong. As to the second prong, whether the charge the trial court gave covered the same territory as the pattern instruction Drury requested is a closer question. The requested instruction refers specifically to a witness' "reputation for truthfulness in the community," whereas the one actually given covers only witness credibility in more general terms. However, even if we found the content of the proposed instruction inadequately addressed in the actual instruction, satisfying the second prong of the analysis, Drury's assignment of error nevertheless fails under the third prong. Drury has shown no substantial impediment to his ability to present an effective defense as a result of the trial court's failure to give the pattern instruction, and we perceive none.

Drury argues that he needed that instruction because Whatley, the witness Drury characterizes as the crux of the government's case, was shown at trial to have a bad reputation for truthfulness in the community. Indeed, the trial court permitted Drury to vigorously argue as much to the jury, through direct examination of two character witnesses, cross-examination of Whatley, and closing argument. These opportunities to impugn Whatley's character for

32

truthfulness, coupled with the trial court's general instructions on witness credibility, persuade us that the trial court did not abuse its discretion in declining to give Drury's proposed pattern jury charge. Cf. United States v. Ryan, 289 F.3d 1339, 1345 (11th Cir. 2002) ("In light of the opportunities afforded the jury to consider Ryan's entrapment defense, we find that the failure to include specific instructions on the issue did not seriously impair presentation of the defense."); United States v. Chirinos, 112 F.3d 1089, 1101 (11th Cir. 1997) (holding that failure to instruct did not impair a defendant's ability to argue that he did not intend to steal cocaine as charged, but rather money, in light of the defendant's opportunities to elicit supporting testimony and to make closing arguments on the issue).

### III.

Based on the foregoing analysis, we AFFIRM Drury's murder-for-hire conviction under 18 U.S.C. § 1958, and his conviction for possession of a firearm in connection with a crime of violence under 18 U.S.C. § 924(c).

AFFIRMED.