[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-11274

_____

D.C. Docket No. 1:13-cr-20166-MGC-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LAURA GUTIERREZ-ACANDA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 5, 2015)

Before MARCUS, WILLIAM PRYOR and JILL PRYOR, Circuit Judges.

PER CURIAM:

Laura Gutierrez-Acanda appeals her convictions following a jury trial on

multiple counts of bank and wire fraud and a conspiracy to commit those offenses,

arising out of a scheme to fraudulently obtain and improperly disburse residential mortgage loans, in violation of 18 U.S.C. §§ 1349, 1344, and 1343.  Gutierrez-Acanda's sole challenge on appeal involves the sufficiency of the evidence supporting her convictions.  Essentially, she argues that the government failed to establish that she was a knowing and willful participant in the alleged mortgage fraud conspiracy and that she acted with the requisite intent to defraud several financial institutions.  After thorough review, we affirm each of her convictions.

We review a challenge to the sufficiency of the evidence supporting a criminal conviction de novo, United States v. Drury, 396 F.3d 1303, 1312 (11th Cir. 2005), and "we examine the evidence in the light most favorable to the government, drawing all reasonable inferences and making all credibility choices in the government's favor," United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005).  An appellant must do more than "put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt." United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006).  Thus, a court may not overturn a jury verdict "if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." United States v. Rodriguez, 732 F.3d 1299, 1303 (11th Cir. 2013).  Moreover, the test for sufficiency is the same regardless of whether the evidence is characterized as direct

or circumstantial. United States v. Doe, 661 F.3d 550, 560 (11th Cir. 2011) (internal quotation marks and citation omitted). Where circumstantial evidence is involved, however, the verdict must rest on "reasonable inferences, and not mere speculation." United States v. Klopf, 423 F.3d 1228, 1236 (11th Cir. 2005) (internal quotation marks and citation omitted).

To sustain a conviction for bank fraud conspiracy under 18 U.S.C. § 1349, the government must prove beyond a reasonable doubt that (1) two or more persons agreed to a common and unlawful plan to commit bank and wire fraud, as alleged in the indictment; (2) the defendant knew of the unlawful plan; and (3) the defendant knowingly and voluntarily joined the plan. United States v. Moran, 778 F.3d 942, 960 (11th Cir. 2015). But the defendant need not have known "all of the details" of the conspiracy. Id. (internal quotation marks and citations omitted). Rather, the government must prove that she knew of the conspiracy's "essential nature" and joined it. United States v. Garcia, 405 F.3d 1260, 1270 (11th Cir. 2005) (per curiam) (quoting United States v. Charles, 313 F.3d 1278 (11th Cir. 2002)). Because conspiracies are "predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove [their] elements," including "inferences [drawn] from the conduct of the alleged participants or from circumstantial evidence of a scheme." United States v. Vernon, 723 F.3d 1234, 1273 (11th Cir. 2013) (internal quotation marks and citations omitted).

3

A conviction for bank fraud under 18 US.C. § 1344 requires proof beyond a reasonable doubt that (1) a scheme existed to obtain money in the custody of a federally insured bank by fraud; (2) the defendant participated in the scheme by means of material false pretenses, representations or promises; and (3) the defendant acted knowingly.  18 U.S.C. § 1344(2); United States v. McCarrick, 294 F.3d 1286, 1290 (11th Cir. 2002) (citing United States v. Goldsmith, 109 F.3d 714, 715 (11th Cir. 1997)).  As with conspiracy, "circumstantial evidence may prove [a defendant's] knowledge."  United States v. Williams, 390 F.3d 1319, 1325 (11th Cir. 2004).  Finally, a conviction for wire fraud in violation of 18 U.S.C. § 1343 requires the government to prove beyond a reasonable doubt that "(1) the defendant participated in a scheme or artifice to defraud; (2) with the intent to defraud; and (3) used, or caused the use of, interstate wire transmissions for the purpose of executing the scheme or artifice to defraud."  United States v. Williams, 527 F.3d 1235, 1240 (11th Cir. 2008); 18 U.S.C. § 1343.  Wire fraud, like other federal crimes, can be proven by circumstantial evidence.  United States v. Robertson, 493 F.3d 1322, 1331 (11th Cir. 2007).

At the heart of this case is a dispute about the scope of the charged conspiracy.  The government argues that Gutierrez-Acanda, a closing agent, participated in a scheme to fraudulently obtain and improperly disburse mortgage loans by knowingly preparing fraudulent loan applications and closing documents,

4

and allowing straw purchasers to make required down payments with funds provided by others.  Gutierrez-Acanda characterizes the conspiracy more narrowly, and argues that the essential object of the conspiracy was obtaining false mortgage loans by submitting false applications.  Her defense throughout the proceedings has been that there is no evidence that she personally knew any of the individuals involved or that any unlawful scheme was ever communicated to her.  Rather, she claims that she was duped into repeatedly conducting closings based on fraudulent loan applications that she knew nothing about.

The government's characterization of the alleged conspiracy is accurate. The indictment did charge Gutierrez-Acanda with conspiring to submit "false and fraudulent mortgage loan applications" for the purpose of inducing lenders to make loans.  But it also alleged that the co-conspirators used "straw buyers" to make purchases by submitting false "closing documents and other related loan documents."  It further alleged that they "cause[d] the lenders to loan more money than they otherwise would have loaned by preparing, and submitting to them, false and fraudulent HUD-1 Statements which did not accurately reflect the money disbursed to the buyers and sellers" and that they "divert[ed] fraud proceeds for their personal use and benefit, and to further the fraud scheme."  In short, the indictment alleged a broad conspiracy with numerous objectives, including

improperly disbursing loan proceeds and submitting fraudulent HUD-1 statements and other closing documents.

Because the indictment alleged a conspiracy with multiple objectives, the government was not required to prove that Gutierrez-Acanda knew of and furthered each one -- it was only required to show that she knew of the "essential nature of the conspiracy" and joined it. See Garcia, 405 F.3d at 1270 (internal quotation marks and citation omitted). This means that the government was not necessarily required to show that Gutierrez-Acanda knew that the loan applications were fraudulent, as long as it demonstrated that that she knew of, and voluntarily participated in, an agreement to improperly disburse loan proceeds and falsify closing documents. The government plainly met its burden, and thus Gutierrez-Acanda's arguments are unpersuasive. But even if we were to agree with Gutierrez-Acanda that the government was required to establish her knowledge that the applications were fraudulent -- and as we have said, we do not -- we would still find that the evidence in this record sufficiently established that she in fact had that knowledge.

For starters, the trial testimony established that Gutierrez-Acanda's company, Optimal Title Services, Corp. ("Optimal"), conducted closings for the sales of three pieces of residential property located in Miami, Florida -- with one of

them being sold twice.[1]  All of the mortgages were secured by loan applications containing falsified financial information designed to qualify straw buyers for mortgages they could not actually afford.  Thus, for example, in the loan application for the purchase of the 271 NW Home, codefendant Javier Gonzalez falsified his employer, income, and bank account balances.  In the loan application for the initial purchase of the 5620 NW Home, codefendant Daniel Fonte falsified his income and savings information and falsely stated that he intended to make the home his primary residence.  In the loan application for the purchase of the 1171 NW Home, codefendant Carlos Rodriguez prepared a form which falsified the employment, income, and bank account information of a recruited straw purchaser and falsely stated that he intended to use the home as his primary residence.  And in the loan application for the resale of the 5620 NW Home, codefendants Javier Gonzalez and Daniel Fonte falsified an unwitting straw buyer's employment, income, and savings information and falsely represented the buyer's intention to use the home as her primary residence.

---

[1] The four properties were these: a home at 271 NW 99th Street, Miami, FL (the "271 NW Home," which served as the basis for the bank fraud charge in Count 3); a home at 5620 NW 30th Ave., Miami, FL -- which was sold twice in the scheme (the "5620 NW Home," for which the initial purchase served as the basis for the bank fraud charge in Count 4, and the resale served as the basis for the wire fraud charge in Count 6); and a home at 1171 NW 64th St., Miami, FL (the "1171 NW Home," which served as the basis for the bank fraud charge in Count 5). Gutierrez-Acanda was also charged with conspiracy to commit bank and wire fraud relating to all of these transactions (Count 1).

As the closing agent, Gutierrez-Acanda was responsible for several tasks that enabled the loan to be approved. Specifically, she would conduct title searches, verify that the conditions of the mortgage had been met, notarize and record the closing documents -- including HUD-1 statements -- and remit them to the lender, thereby attesting that the closing was conducted as required, and all conditions precedent had been met. The circumstances under which Gutierrez-Acanda performed these tasks establish that she knowingly participated in a scheme to improperly disburse loan proceeds and prepare false closing documents in furtherance of a broad conspiracy. Much of the same evidence suggests that she was also aware that the loan applications themselves were fraudulent.

First, it is clear on the record that Gutierrez-Acanda improperly disbursed loan proceeds to the applicants on three different occasions. As the closing agent, Gutierrez-Acanda was responsible for notarizing various documents, including HUD-1 statements, which indicated whether "the buyer [was] required to bring a cash to close payment" to the closing. Other closing documents mandated that the payment be made with the buyer's own money. After the closings, Gutierrez-Acanda would attest to the lender that the "loan closed as scheduled," which included "a representation that the borrower made his [required] cash-to-close payment." Only then would the lender authorize the release of the loan proceeds. The record established that Gutierrez-Acanda knew that it was improper for a

closing agent to disburse any loan payments until she had received a cash to close payment. Notably, several witnesses testified that it would never be appropriate to disburse loan proceeds prior to receiving the buyer's cash to close payment. Indeed, Gutierrez-Acanda's own witness (Marilyn Hurtado, a former Optimal employee) testified that Gutierrez-Acanda taught her that a "deal cannot close until [the closing agent] receive[s] that money from the buyer."[2]

Despite Gutierrez-Acanda's knowledge that the early disbursement of loan proceeds was improper, she did precisely that in three of the four transactions at issue -- the sale of the 271 NW Home; the sale of the 1171 NW Home; and the resale of the 5620 NW Home. Moreover, Gutierrez-Acanda apparently improperly released loan proceeds only when the applications were fraudulent -- suggesting that she was aware of and knowingly participated in the scheme to submit fraudulent loan applications. In the nine-month period during which these transactions took place, Optimal closed a total of fifty-five home sales. Yet the three sales charged in the indictment -- which involved largely the same cast of characters -- were the only instances in which Gutierrez-Acanda prematurely disbursed loan proceeds.

---

[2] During its deliberations, the jury sent out a question regarding the legality of disbursing loan proceeds prematurely. The parties agreed to a statement that, although the early disbursement of loan proceeds is improper, it is not itself illegal unless done as "part of a scheme or conspiracy to defraud."

On these occasions, the proceeds actually were funneled from the seller back to the straw buyer for fraudulent use as the down payment all three times, further supporting the inference that Gutierrez-Acanda only released loan proceeds early when she knew that funds were necessary to assemble a straw buyer's cash to close payment. Indeed, as the government put it, "it is inconceivable that Gutierrez-[Acanda] would have exposed herself to liability for having improperly released loan proceeds unless she had made suitable assurances that the derelict down payments would, in fact, be made." Also incriminating is the timing of the payments. In one transaction (which occurred on a Friday), the loan proceeds were transferred from the seller's company, to the seller personally, to the straw purchaser, and then used to purchase a cashier's check for the deposit in just two hours and seventeen minutes. That check cleared Gutierrez-Acanda's bank the very next Monday -- demonstrating her awareness of the origin of the funds.

Second, the fact that Gutierrez-Acanda falsified documents that directly led to the approval of the loans demonstrates that she knowingly participated in the mortgage fraud. Thus, for example, in the early disbursement transaction involving the 271 NW Home (Count 3), Gutierrez-Acanda faxed a falsified verification that she had received $5,000 in required earnest money from the straw buyer (Javier Gonzalez) when in fact no such earnest payment had ever been made. The underwriter relied on that fax when she approved the loan.

10

In still another early disbursement transaction involving the resale of the 5620 NW Home (Count 6), Gutierrez-Acanda notarized several closing documents and represented to the lender that the closing had taken place as required.  Yet the unwitting straw buyer testified that she never attended a closing, never met Gutierrez-Acanda, and was totally unaware that she had "purchased" the property until law enforcement investigators knocked on her door.

Third, the fact that Gutierrez-Acanda embezzled portions of the loan proceeds for herself suggests that she knew the transactions were fraudulent.  Evidence established that Gutierrez-Acanda made an improper payment to herself relating to the initial purchase of the 5620 NW Home (Count 4).  Indeed, she pilfered funds earmarked for the payment of back taxes on the property.  Thus, she purchased a $4,695.55 cashier's check payable to the Miami Dade Tax Collector as she was required to do, but she then deposited that check into her own Optimal bank account.  Notably, she did not make the required payment to the tax collector.  Equally telling, the straw buyer (Daniel Fonte), lodged no complaint.  Because a legitimate buyer would presumably have wanted the taxes on his property paid, the fact that no objection was lodged suggests that that the Gutierrez-Acanda and Fonte were co-conspirators.

Finally, we note that, in the single instance where Gutierrez-Acanda did not prematurely disburse the loan proceeds -- relating to the initial purchase of the

11

5620 NW Home (Count 4) -- still other evidence evinced her knowing participation in the fraudulent mortgage scheme.  In the first place, the straw buyer (Daniel Fonte) initially bounced a $5,000 check for earnest money.  The payment was successfully made only after another codefendant (Aldrick Gonzalez, through his company Toko Property Holdings, LLC) subsequently provided the straw buyer with the required funds.  Notably, codefendant Carlos Rodriguez served as the mortgage broker for that purchase, the same role he previously played in the 271 NW Home transaction -- one in which Gutierrez-Acanda prematurely released loan proceeds for use as the cash to close payment.  Gutierrez-Acanda closed the transaction in spite of the bounced check and the participation by the same players from previous fraudulent transactions, suggesting that she was aware of the scheme to use an unqualified straw buyer to purchase the 5620 NW Home.

Viewing all of this evidence in the light most favorable to the verdict and drawing all inferences in the government's favor, as we are required to do at this stage in the proceedings, there is ample evidence demonstrating Gutierrez-Acanda's knowledge of the essential nature of the unlawful scheme and her willing participation within that conspiracy.  Garcia, 405 F.3d at 1269-70.  Quite simply, Gutierrez-Acanda knew that the straw buyers were not qualified to purchase the properties and that they did not make the required down payments with their own money.  She nonetheless closed the transactions (in one instance without the

buyer's presence or knowledge) and facilitated the fraudulent use of loan funds for down payments.

The facts taken as a whole allowed the jury in this case to find beyond a reasonable doubt that Gutierrez-Acanda was a knowing and integral part of the scheme to defraud alleged in Count 1. See, e.g., United States v. Nguyen, 493 F.3d 613, 617-25 (5th Cir. 2007) (finding sufficient evidence that the defendant closing agents knowingly participated in a bank fraud conspiracy where they closed several transactions with repeat players and signed HUD-1 statements despite releasing loan funds later used for down payments). As for the substantive counts (Counts 3-6), the evidence presented at trial likewise allowed the jury to find beyond a reasonable doubt that Gutierrez-Acanda acted knowingly and with the intent to defraud. See, e.g., id.; United States v. Trujillo, 561 F. App'x 840, 844-45 (11th Cir. 2014) (per curiam) (finding sufficient evidence to support bank and wire fraud convictions where a closing agent repeatedly disbursed loan funds before receiving cash to close payments -- and to unauthorized third parties -- despite knowledge that it was "frowned upon").

Accordingly, we cannot say that no "reasonable construction of the evidence would have allowed the jury to find [her] guilty beyond a reasonable doubt." Rodriguez, 732 F.3d at 1303. Gutierrez-Acanda's convictions are affirmed.

**AFFIRMED.**