[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10272

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

GRETCHEN BUSELLI,
a.k.a. Gretchen Yarbrough,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:21-cr-00045-MW-MAF-1

_____

Before JORDAN, LAGOA, and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, Gretchen Buselli appeals her convictions for a murder-for-hire plot targeting her husband and for making false statements to a federal agent.  Buselli challenges the jury instructions given on both convictions and the constitutionality of her false-statements conviction.  After careful review of the record and the parties' briefs, and with the benefit of oral argument, we affirm Buselli's convictions.

## I.     TRIAL EVIDENCE

As recounted below, the trial evidence included, *inter alia*, recorded phone calls of Buselli hiring "Paul" to murder her estranged husband and pictures capturing Buselli leaving $5,000 in cash in a lunch box in a designated area for "Paul."  Here's the sequence of events.

## A.     Buselli's Daughter

In 2020, Buselli reported to authorities several times that her estranged husband, Bradley Buselli, was physically and sexually abusing their daughter.[1]  Buselli and Bradley lived in Florida, were separated, and shared custody of their daughter.

Buselli's abuse allegations were investigated by the Tallahassee Police Department, the Children's Home Society of

---

[1] Throughout this opinion, we refer to Gretchen Buselli as "Buselli" and Bradley Buselli as "Bradley."

23-10272          Opinion of the Court          3

Florida, the Florida Department of Children and Families[2], and the guardian ad litem appointed in Buselli and Bradley's divorce proceedings to represent the interests of their daughter. Each concluded that no evidence supported Buselli's abuse allegations. Notably, the guardian ad litem recommended that Bradley be granted majority custody of his daughter because the guardian believed Buselli was attempting to take her daughter and move to Oregon.

## B.    The Murder-For-Hire Plot

In June 2021, Christopher Colon, who lived in Montana, reported to the Hillsborough County, Florida Sheriff's Department that Buselli asked him to murder Bradley. Buselli was Colon's former high school girlfriend. Because Colon lived in Montana, Florida authorities contacted the Federal Bureau of Investigation ("FBI") for assistance. An FBI agent contacted Colon in Montana and gave Colon a recorder to capture his calls with Buselli.

On July 9, 2021, Colon recorded a call with Buselli. Buselli expressed her frustration with the failure of Child Protective Services and a state court judge to act on her reports that Bradley had sexually and physically abused their daughter.

---

[2] The Department of Children and Families conducted three investigations into separate allegations of Bradley's abuse, but each investigation—as well as a final quality review of those investigations—uncovered no evidence of abuse.

Discussing Bradley's murder, Buselli stated on the recorded call: "I have been thinking about this for a year, and um I have checked in with myself multiple, multiple, multiple times. I have paused in the anger. I have rejected the idea. I have thought about karma, . . . I have thought about [my daughter] growing up not knowing her father." Buselli said that she would receive full custody of her daughter after Bradley was missing for 60 days and "at that point, I'll put the house up for sale, bam, gone."

As to how Bradley would be killed, Buselli stated: "The easiest thing would be for you [to] just pop him and get the fuck out of there fast, but again that's going to instantly trigger a homicide investigation." Colon suggested that he could throw Bradley into the ocean, to which Buselli responded, "it's not going to trigger a homicide investigation immediately" and "that gives me time to be like 'oh my god what the fuck, her dad just disappeared, I don't know what happened.'" Buselli added that dumping Bradley into the ocean would be more complicated for Colon, but would leave "no trace, fish food, no trace." Colon stated, "Alright so basically you want me to snatch him up, put him on a boat, get rid of his ass, real easy." Buselli responded, "I think as far as the investigation aspect and the legal ramifications, that is the best."

Buselli also confirmed that she had not talked to anyone else about killing Bradley. Buselli discussed mailing "ghost credit cards" to Colon to pay for him to travel to Florida.

A few weeks after the July 9 phone call, Buselli mailed Colon two $500 pre-paid debit cards. Authorities intercepted envelopes from Buselli to Colon containing (1) the debit cards with user agreements, and (2) photographs of Bradley, his home and work addresses, and his vehicle information.

## C.    "Paul" — The Undercover Agent

Ultimately, the FBI planned to have Colon pass off Buselli to "Paul," purportedly Colon's friend, but actually an undercover agent. On August 20, 2021, Colon recorded a call with Buselli in which he told her that he was concerned authorities would connect him to Bradley's murder, and Colon would not have an alibi for the time it would take to drive to Florida, murder Bradley, and return to Montana. Colon told Buselli that he had a friend, "Paul," who lived in Florida, owned a boat, and could carry out the plan to murder Bradley.

On August 23, 2021, Colon texted Buselli that he "talked to Paul and he's 100% on board and wants to get involved[.]" Buselli responded, "Thank you so much! Yes please give him this number."

On August 26, 2021, Buselli and "Paul" spoke on the phone in a recorded call. Buselli explained that Bradley was molesting their daughter, Child Protective Services was not helpful, and she wanted to move back to Oregon, but Bradley was getting in the way. Buselli told "Paul" she was "thinking about it" for over a year and was 100% sure she wanted Bradley gone forever. Buselli gave "Paul" information about Bradley, including his age, height,

weight, and his work and home addresses. Buselli agreed to pay "Paul" $5,000 up front and $20,000 after the murder. Buselli said she wanted "Paul" to use his boat to "just take [Bradley] out, and, disappear him" so there would be "no trace . . . missing person forever." Buselli agreed to leave $5,000 for "Paul" to pick up in a public place, like a Walmart or a Greyhound bus station.

Buselli and "Paul" spoke again on September 8, 2021, in a recorded call. Buselli provided "Paul" with Bradley's new home address. Buselli proposed to leave the $5,000 at a large outdoor amphitheater because it was a public place without any cameras. Buselli confirmed that the agreement with "Paul" was for "five upfront, and 20 after, to make it never found." Buselli said she had $7,000-$8,000 in African Krugerrand gold coins and could pay "Paul" the remaining amount after she sold her home.[3] In response to this phone call, investigators installed a camera facing the amphitheater and captured Buselli as she left $5,000 in cash in a lunch box in the seating area of the amphitheater.

With the murder-for-hire plot in motion, investigators wanted to make it seem that Bradley had actually disappeared. So investigators contacted Bradley, explained the murder-for-hire plot, put him in a hotel, and asked him not to make any phone calls or

---

[3] Investigators later found six Krugerrand coins in Buselli's residence. For reference, in September 2021, one 1-ounce Krugerrand was worth between $1,749.80 and $1,864.05. *Historical Prices for Krugerrand 1 oz*, BUSINESS INSIDER, https://perma.cc/Z64V-39E6.

use the internet. Investigators also had Bradley miss a scheduled FaceTime call with his daughter while she was with Buselli on the night of September 15, and investigators had Bradley miss work on September 16.

On September 16, 2021, "Paul" and Buselli spoke on the phone. "Paul" told Buselli "[i]t's done" and "it was quick and clean, and he had no idea what it was about," to which Buselli said "[t]hank you" and that she felt "relieved." The two agreed to speak again on October 16 to discuss Buselli's remaining payment to "Paul."

## D.     Buselli's Statements to the FBI

Also on September 16, 2021, investigators, including an FBI agent, contacted Buselli at her home. Under the guise that Bradley had disappeared, investigators asked her to come to the police station for questioning, which she voluntarily did. Once at the police station, investigators read Buselli her *Miranda*[4] rights, and Buselli signed a form stating she understood and waived her rights.

Buselli detailed her troubled relationship with Bradley. Buselli explained that the couple separated and Bradley moved out of their home after a fight in which Buselli struck Bradley, which led to the police being called. Buselli clarified that Bradley had

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

23-10272            Opinion of the Court            8

never hit her.  Soon after this fight, Buselli began reporting Bradley to authorities for physically and sexually abusing their daughter.

Investigators then told Buselli it was a crime to lie to a federal agent and asked her if she knew anybody "that would do anything like this?"—referring to Bradley's apparent disappearance.  Buselli replied, "No.  I would never ask anyone to do something like this."  Investigators then asked, "how would you feel if something happened to him?"  Buselli replied, "I don't know. I don't want something to happen to him."

Eventually, investigators revealed that they had been surveilling Buselli, that "Paul" was an undercover agent, and that they knew about the murder-for-hire plot.  Investigators asked why Buselli wanted Bradley dead, to which she responded, "He's molesting my daughter."  Investigators noted that several investigations into Bradley's purported abuse of their daughter concluded that no abuse occurred.  Investigators then arrested Buselli.[5]

---

[5] Upon Buselli's arrest, authorities released her daughter into Bradley's custody.  Authorities concluded that Bradley did not pose a danger to his daughter based on the conclusions of the investigations into the purported abuse, as well as a separate interview conducted by an FBI victim witness specialist.

23-10272                Opinion of the Court                9

## II.    PROCEDURAL HISTORY

### A.    Indictment

Buselli was indicted on two counts: (1) use of interstate commerce "with intent that the murder of [Bradley] be committed in violation of the laws of the State of Florida" as consideration for payment, in violation of 18 U.S.C. §§ 1958(a), 2; and (2) knowingly and willfully making materially false statements, in violation of 18 U.S.C. § 1001(a)(2). The false-statements charge was based on these two statements Buselli made to investigators: "I would never ask anyone to do something like this" and "I don't want something to happen to him."

### B.    Jury Instructions: False Statements

For the *mens rea* element of the false-statements charge, the government proposed this jury instruction: "the Defendant acted willfully, knowing that the statement was false." The government's instructions included a definition of the terms "knowingly" and "willfully." Buselli did not object to the government's *mens rea* instruction.

### C.    Jury Instructions: Murder-For-Hire

Buselli did contest the government's instructions for the murder-for-hire charge. After both parties submitted proposed instructions, the district court held two hearings and requested briefing on the issue. We set forth their positions.

The government's instructions explained that the elements of the murder-for-hire charge under § 1958 were (1) "the Defendant

used or caused another person to use the mail or a facility of interstate commerce," (2) "with the intent that *a murder be committed in violation of the laws of the State of Florida*," and (3) "as consideration for the receipt of, or promise, or agreement to pay anything of pecuniary value." (Emphasis added.) The government's instructions defined murder as "the unlawful, premeditated killing of a human being with malice aforethought. A 'premeditated killing' is a killing after consciously deciding to do so." This definition is consistent with Florida law's definition of murder as "[t]he unlawful killing of a human being . . . [w]hen perpetrated from a premeditated design to effect the death of the person killed or any human being." *See* Fla. Stat. § 782.04(1)(a)(1).

Buselli argued that the government's instructions inadequately explained what constitutes murder in violation of Florida law. Buselli argued the district court must also instruct the jury on the Florida defenses to murder, which are excusable homicide, justifiable homicide, and a killing by the justifiable use of deadly force. *See* Fla. Stat. §§ 782.02, 782.03, 776.012. Buselli argued that Florida's defenses to murder were necessary for the jury to determine whether she intended the murder-for-hire plot to result in a lawful or an unlawful killing. However, Buselli acknowledged that she did not anticipate "any affirmative testimony saying this was a justifiable homicide -- or justifiable use of deadly force."

The government responded that no instructions on Florida's defenses to murder should be given because no evidence supported

them, and, in any event, Buselli's crime was solicitation of a murder under federal law, not commission of a murder under Florida law.

The district court issued a preliminary order on the murder-for-hire instructions. First, the district court determined that an instruction on the justifiable use of deadly force was required under Florida law only when supported by evidence and where the defense theory was valid. The district court stated that it would not give this instruction unless Buselli (1) cited caselaw showing that the justifiable use of deadly force was a defense to a Florida solicitation-for-murder charge, and (2) proffered evidence demonstrating that Buselli's intended use of force against Bradley was justifiable under Florida law.

Second, the district court acknowledged that Florida law usually requires instructions on excusable and justifiable homicide in all murder cases. However, the district court determined that it would not give these instructions because (1) Buselli stated she would not present evidence that the murder-for-hire plot constituted excusable or justifiable homicide; (2) if there was no evidence supporting either defense, the district court would have to instruct the jury that neither was a defense to her murder-for-hire charge, which would confuse the jury; and (3) the district court had an obligation to not confuse the jury. Accordingly, absent evidence at trial showing that excusable or justifiable homicide applied to Buselli's conduct, the district court concluded that it would not instruct the jury on these defenses.

### D.    Buselli's Trial Testimony

At trial, Buselli testified and her defense theory was that during her conversations with Colon and "Paul," she never actually intended for Bradley to be murdered.  Prior to any of the recorded conversations, Colon offered to kill Bradley because Buselli told him about Bradley's abuse of her daughter.  Buselli stated she did not take Colon seriously and "just blew it off as a derogatory remark."  Colon suggested to Buselli that he could come to Florida and beat up Bradley or shoot Bradley through the door, but Buselli told Colon not to do that.

As to the recorded July 9, 2021, call between Buselli and Colon, Buselli explained she had drunk "quite a bit of red wine." Buselli was concerned about Bradley's abuse of their daughter and that the Department of Children and Families was not taking her concerns seriously.  Buselli admitted she spoke with Colon on the July 9 call about killing Bradley, but she clarified that she was just mad and "vented."  Buselli further asserted that if Colon had come to Florida, she "was willing to let him confront Bradley," and she mailed Colon Bradley's address and $1,000 in prepaid debit cards for gas money for Colon's trip to Florida.

Turning to the recorded August 20, 2021, call with Colon, Buselli testified that Colon told her he was not coming down to Florida, and she believed Colon had stolen the $1,000 she mailed to him.  Buselli also testified that when Colon said he spoke to "Paul," Buselli suspected that "Paul" was going to ask for money from her too.

As to the recorded August 26, 2021, call between Buselli and "Paul," Buselli testified that she was terrified because "Paul" was asking her for $20,000. On the call, Buselli discussed "Paul" killing Bradley, but Buselli did not intend for Bradley to be killed and she believed "Paul" was scamming her. Buselli went forward with paying "Paul" because she was scared of him, and she "was absolutely confident at that point that Bradley was in no danger."

Buselli was shocked when, on September 16, 2021, "Paul" called her to tell her he had killed Bradley. Buselli told "Paul" "'thank you,' but that wasn't genuine for sure." Buselli did not "have a logical answer" for why she did not tell investigators during her questioning about what had happened with "Paul" and Colon.

On cross-examination, Buselli admitted that she talked with Colon and "Paul" about murdering Bradley and that it was against the law in Florida to commit murder. But Buselli explained that she was just "venting" in her calls with Colon and "Paul," and she "didn't believe these men." Buselli testified that she "did not want [Bradley] murdered," she "wanted a healing path for our family." Buselli mailed Colon $1,000 because she "was willing to let him intervene, not murder Bradley." Buselli testified, "I really truly thought this was a fraud/extortion scam," but she acknowledged that she never asked Colon to return the money she mailed him and never contacted the police. Buselli also acknowledged she had specific conversations about how "Paul" would kill Bradley, but she did not believe "Paul" would actually kill Bradley.

### E.    Jury Instructions Ruling at Trial

After both sides presented their cases at trial, Buselli renewed her objections to the jury instructions. Buselli and the government relied on their prior arguments. The district court declined to give the instructions for excusable or justifiable homicide because there was no caselaw or evidence at trial supporting that either applied to Buselli's conduct.

Buselli's counsel acknowledged that Buselli's own testimony did not support giving the instruction on the justifiable use of deadly force. But Buselli's counsel argued that some other evidence supported this instruction because the government presented tapes of the FBI's interrogation of Buselli, in which Buselli referenced the abuse of her daughter. The district court observed that the justifiable use of deadly force could be used to protect another, such as Buselli's daughter, against an imminent harm. The district court found, however, that there was no evidence of an imminent harm to Buselli's daughter. The district court noted that applying the defense of justifiable use of deadly force to the facts of this case "would be an invitation to absolute lawlessness to say you could murder a child molester because the government wasn't taking adequate steps to investigate and/or arrest the perpetrator."

### F.    District Court's Instructions to the Jury

The district court then instructed the jury. As to the murder-for-hire charge, the district court instructed that Buselli could be found guilty only if the government proved beyond a reasonable doubt, among other things, that she acted "[w]ith the

intent that the murder be committed in violation of the laws of the State of Florida."[6]　The district court instructed that "[m]urder is the unlawful, premeditated killing of a human being with malice aforethought and is a violation of the laws of the State of Florida." The district court did not instruct the jury on excusable or justifiable homicide, or the justifiable use of deadly force.

As to the false-statements charge, the district court instructed the jury that it was "a federal crime to willfully make a false or fraudulent statement to a department or agency of the United States."　The district court explained that, to find Buselli guilty, the jury had to find that, among other things, she "acted willfully, knowing that the statement was false."　The district court defined the terms "knowingly" and "willfully" as follows:

> The word "knowingly" means that an act was done voluntarily and intentionally and not because of a mistake or by accident.

> The word "willfully" means that the act was committed voluntarily and purposely with the intent to do something the law forbids, that is, with a bad purpose to disobey or disregard the law.　While a person must have acted with the intent to do

---

[6] The district court also instructed that "[a] premeditated killing is killing after consciously deciding to do so.　The decision must be present in the mind at the time of the killing.　The law does not fix the exact period of time that must pass between the formulation of the premeditated intent to kill and the killing. The period of time must be long enough to allow reflection by the defendant. The premeditated intent to kill must be formed before the killing."

something the law forbids before you can find the person acted willfully, the person need not be aware of the specific law or rule that his or her conduct may be violating.

## G.    Verdict

The jury found Buselli guilty on both counts.  The district court sentenced Buselli to 180 months' imprisonment.[7]  Buselli timely appealed.

## III.    STANDARDS OF REVIEW

We review *de novo* the legal correctness of a jury instruction, but we review for an abuse of discretion the phrasing of an instruction or a district court's refusal to give a requested instruction.  *United States v. Mayweather*, 991 F.3d 1163, 1174 (11th Cir. 2021).

Further, a challenge to jury instructions is subject to harmless-error review.  *United States v. Heaton*, 59 F.4th 1226, 1241 (11th Cir. 2023).  Under harmless-error review, we ask "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," *i.e.*, whether there is a "reasonable doubt that the jury would have reached the same result with or without that instruction."  *United States v. Drury*, 396 F.3d 1303, 1314 (11th Cir. 2005).

---

[7] On appeal, Buselli does not challenge her sentence.

We review for plain error where a party challenges for the first time on appeal a jury instruction or the constitutionality of a statute. *United States v. Hughes*, 840 F.3d 1368, 1384 (11th Cir. 2016). To establish plain error, a defendant must show there is (1) an error, (2) that is plain, and (3) that affects substantial rights. If the defendant makes this showing, we have discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* "When the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Duldulao*, 87 F.4th 1239, 1252 (11th Cir. 2023) (quotation marks omitted).

## IV.    MURDER-FOR-HIRE JURY INSTRUCTIONS

The first issue involves the jury instructions on the murder-for-hire crime in 18 U.S.C. § 1958.

### A.    18 U.S.C. 1958(a) — Murder-For-Hire

Section 1958(a) prohibits a person (1) from traveling in or causing another to travel in interstate or foreign commerce, or using or causing another to use any facility of interstate or foreign commerce, (2) "with intent *that a murder be committed in violation of the laws of any State* or the United States," (3) in return for a promise or agreement to pay anything of pecuniary value. *See* 18 U.S.C. § 1958(a) (emphasis added); *United States v. Preacher*, 631 F.3d 1201, 1203 (11th Cir. 2011).

The government argues that the text in § 1958(a)—"with intent that a murder be committed in violation of the laws of any

23-10272                 Opinion of the Court                 18

State"—has a definitional role and serves only to identify the generic kind of conduct tied to interstate activity for which the federal statutes makes it illegal to pay. The district court thus only had to charge the jury, as it did, that "[m]urder is the unlawful, premeditated killing of a human being with malice aforethought and is a violation of the laws of the State of Florida." This instruction contains the generic definition of murder that Florida law proscribes and is all that was required.

Buselli contends that the district court was required to go further because Florida law distinguishes between lawful and unlawful killings. Buselli argues the jury had to be instructed on Florida's defenses of justifiable and excusable homicide and the justifiable use of deadly force because these defenses result in a lawful killing. Buselli contends that the jury needed to know these defenses to decide whether Buselli intended her murder-for-hire plot to result in an unlawful or a lawful killing under Florida law.

The parties do not cite any circuit precedent as to this § 1958 text—"with intent that a murder be committed in violation of the laws of any State." A few of our sister circuits, however, have dealt with somewhat similar arguments regarding § 1958 prosecutions for violations of state law. These decisions bolster our determination that the district court did not err in refusing to give Buselli's requested jury instructions for justifiable homicide,

excusable homicide, or the justifiable use of deadly force under Florida law.

For example, in *United States v. Lisyanski*, 806 F.3d 706, 712 (2d Cir. 2015), the Second Circuit upheld a § 1958 conviction despite the defendant's contention "that the district court constructively amended the indictment by failing to instruct the jury on the definition of murder found in N.Y. Penal Law § 125.25, the state law underlying the murder-for-hire charges in the indictment." The Second Circuit held that the defendant "failed to show that the district court's instruction altered the 'core of criminality' of the charged offenses," and that "[t]he instruction given was in accordance with a standard modern jury instruction to which Lisyansky not only failed to object but agreed should be given." *Id.* (citing Leonard B. Sand, et al., 3 Modern Federal Jury Instructions-Criminal ¶ 60.02, Instruction 60-16 cmt. (2023) (noting that with respect to the intent element of a murder-for-hire charge, "[t]he jury should not be charged on the elements of murder. Whether the murder would violate state or federal law is a question of law for the court.")).

Similarly, in *United States v. Wynn*, 987 F.2d 354, 357–58 (6th Cir. 1993), the Sixth Circuit held that the government was not required to prove that murder was a crime under Tennessee law and that it was enough for the district court to have instructed the jury generally "that murder violates Tennessee law." And in *United States v. Robertson*, 473 F.3d 1289, 1294 (10th Cir. 2007), the Tenth Circuit rejected the defendant's argument that the jury in a § 1958

case should have been instructed that murder is the killing of another human being with malice aforethought pursuant to Oklahoma's statutory definition. *See also United States v. Angleton*, 221 F. Supp. 2d 696, 726 (S.D. Tex. 2002) (ruling on a motion to dismiss the indictment: "[§ 1958] does not incorporate Texas Penal Code § 19.03 [the Texas capital murder statute] such that an acquittal under [§] 19.03 could bar a prosecution under [§] 1958").

Finally, in *United States v. Morin*, 80 F.3d 124, 126–27 & n.3 (4th Cir. 1996), the Fourth Circuit rejected the defendant's arguments that he could not have been found guilty under Virginia law (or the laws of the United States) because the murder was to occur outside of the United States and because, as a matter of Virginia law, he could not have been convicted for conspiracy to commit murder where the conspiracy was with an undercover FBI agent. The Fourth Circuit noted that, state law nuances aside, the relevant question was whether the defendant had the "intent" to conspire with a hit man to commit murder, and that under the plain terms of the statute, this was sufficient. *Id.* at 127 n.3. As set forth by the Fourth Circuit, "[q]uestions of ultimate prosecution and jurisdiction . . . simply exceed the plain meaning of § 1958. The 'violation' element of murder-for-hire is a low hurdle, nothing more than an abstract comparison of a crime's elements with what the defendant intended to accomplish." *Id.* at 127 n.2. "Any further inquiry would lead courts down the path of speculation and

distract both courts and juries from the central issues at stake in a § 1958 prosecution[.]" *Id.*

Likewise, virtually the same text is employed in another federal criminal statute, the Travel Act, 18 U.S.C. § 1952, which courts have interpreted. Specifically, the Travel Act prohibits interstate activity with intent to further certain crimes, including extortion and arson, *"in violation of the laws of the State in which committed"* or of the United States. 18 U.S.C. § 1952(a), (b) (emphasis added). In fact, when § 1958 was originally enacted in 1984, it was located at 18 U.S.C. § 1952A, alongside the Travel Act. *See Drury*, 396 F.3d at 1309 n.1. Both the Supreme Court and our predecessor Court have interpreted this same statutory text in § 1952, and thus, those cases, discussed below, are also instructive.

### B.    18 U.S.C. § 1952 — Travel Act

In *United States v. Nardello*, 393 U.S. 286, 287-88 (1969), the defendants were indicted under the Travel Act, 18 U.S.C. § 1952, for traveling in interstate commerce to promote extortion in violation of the laws of Pennsylvania. At that time, § 1952(a), provided, *inter alia*, "[w]hoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to . . . promote . . . *any unlawful activity*," is punishable as provided in the statute. *Id.* at 287 n.1 (emphasis added). In turn, § 1952(b) defined "unlawful activity" as "extortion, bribery, or

arson *in violation of the laws of the State in which committed* or of the United States." *Id.* (emphasis added).[8]

In *Nardello*, a distinction in Pennsylvania law was made between extortion and blackmail, with extortion applying to only public officials. *Id.* at 288. Because the defendants were not public officials, the district court dismissed the indictment, reasoning the phrase, "in violation of the laws of the State," meant "extortion" was to track closely the state law. *Id.* When the government appealed, the defendants argued "that Congress' decision not to define extortion combined with its decision to prohibit only extortion in violation of state law compels the conclusion that peculiar versions of state terminology are controlling." *Id.* at 288-89, 293.

Reversing the dismissal of the indictment, the Supreme Court held that Congress's intent in defining extortion by reference to state law was meant to aid local law enforcement officials in general, "not to eradicate only those extortionate activities which any given State denominated extortion." *Id.* at 293-94. The Supreme Court "decline[d] to give the term 'extortion' an unnaturally narrow reading," and concluded that "the generic term extortion" should be used to judge whether the Travel Act covered the defendants' conduct. *Id.* at 296. The Supreme Court reasoned that relying on how states chose to classify extortionate conduct under their criminal laws would lead to uneven application of the

---

[8] With minor word changes irrelevant in *Nardello* and in this appeal, § 1952 reads the same today. *See* 18 U.S.C. § 1952.

Travel Act, and it could "discern no reason why Congress would wish to have [the Travel Act] aid local law enforcement efforts in Utah but to deny that aid to Pennsylvania when both States have statutes covering the same offense." *Id.* at 294-95.

After *Nardello*, our predecessor Court likewise held that § 1952's reference to "state law merely serves a definitional purpose." *United States v. Conway*, 507 F.2d 1047, 1051 (5th Cir. 1975) (discussing *Nardello*, 393 U.S. at 295).[9]  The defendant Conway was convicted under § 1952 for "traveling in interstate commerce with intent to promote the unlawful activity of arson in violation of Maryland laws." *Id.* at 1048.  When instructing the jury, the district court did not define arson under Maryland law. *Id.* at 1051.

Our predecessor Court concluded arson "is a commonly used and understood word," and the Travel Act did not otherwise require jury instructions on Maryland's definition of arson. *Id.* at 1051-52.  The Court explained that "proof of the violation of the [underlying state law] to which reference is made for purposes of prosecution under [the Travel Act] is not an essential element to be proved in such a federal prosecution." *Id.* at 1051.

In yet another § 1952 case, our predecessor Court repeated that "state law merely serves a definitional purpose," and "[t]here

---

[9] Our predecessor Court also described *Nardello* as stressing that "Congress did not intend to restrict the coverage of the 'Travel Act' by defining extortion according to state labels" and "it was sufficient that the acts for which the [defendant] was indicted fall within the 'generic term' of extortion." *Conway*, 507 F.2d at 1051 (quoting *Nardello*, 393 U.S. at 295).

is no need to prove a violation of the state law as an essential element of the federal [§ 1952] crime." *United States v. Prince*, 515 F.2d 564, 566 (5th Cir. 1975) (quotation marks omitted). The *Prince* defendants were convicted of conspiracy to engage in interstate prostitution activities. *Id.* at 565. But the West Virginia statute that prohibited prostitution did not define prostitution. *Id.* at 566. Affirming the convictions, our predecessor Court held "[w]e need not concern ourselves, then, with the lack of a definition of 'prostitution' within the West Virginia statute" underlying the Travel Act convictions. *Id.* This was because prostitution is "a generic term" and "the definition of the trial court 'sexual intercourse for hire' sufficiently described the offense." *Id.*; *see also United States v. Jones*, 642 F.2d 909, 913 n.5 (5th Cir. Apr. 1981) ("A prosecution under [§] 1952 is not restricted to state law definitions of the unlawful activity. It can prevail upon showing that the acts fall within the generic term charged.").

Citing *Conway*, discussed above, the Tenth Circuit recently interpreted the statutory language "murders . . . in violation of the laws of any State" in 18 U.S.C. § 1959(a)(1), another federal criminal statute known as VICAR ("Violent crimes in aid of racketeering activity"). *See United States v. Garcia*, 74 F.4th 1073, 1083, 1124 (10th Cir. 2023). The Tenth Circuit ruled that this statutory text "does not require that a person could be charged or convicted of murder under state law." *Id.* at 1124. The Tenth Circuit pointed out how other courts have concluded "that a violation of state law is not an element of the Travel Act, but rather serves a definitional purpose in characterizing the proscribed conduct." *Id.* (quotation marks

23-10272              Opinion of the Court                    25

omitted) (collecting cases including *Conway*, 507 F.2d at 1051).  As aptly put in *Garcia*, "the government need not be able to convict a defendant of a state law violation.  Instead, state law simply defines the prohibited conduct."  *Id.*

With this background, we return to Buselli's appeal.

## C.      No Jury-Instruction Error

While we have yet to address the meaning of "with intent that a murder be committed in violation of the laws of any State" in federal § 1958 prosecutions, we do not write on a blank slate. Our precedent holds that virtually the same statutory language in § 1952 of the Travel Act—"in violation of the laws of the State in which they are committed"—merely serves a definitional purpose in describing the generic conduct prohibited.[10]   *See Conway*, 507 F.2d at 1048, 1051; *Prince*, 515 F.2d at 566; *Jones*, 642 F.2d at 913 n.5.  And under our precedent, there is no need *to prove* an actual state law crime as an essential element of the federal § 1952 crime. *See Conway*, 507 F.2d at 1051; *Prince*, 515 F.2d at 566.

Similarly, the statutory text of § 1958(a) does not require that a person be charged and convicted of murder under state law or even that a murder actually happened.  *See* 18 U.S.C. § 1958(a). Rather, the federal statute requires only that the person intend that a murder be committed.  *See United States v. Delpit*, 94 F.3d 1134,

---

[10] Decisions by the former Fifth Circuit handed down before October 1, 1981, are binding on this Court.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

1149 (8th Cir. 1996) ("[Section 1958] does not prohibit murder or attempted murder. Instead, it outlaws using interstate-commerce facilities with the intent that murder-for-hire be committed."). Further, the § 1958(a) reference "with intent that a murder be committed in violation of the laws of any State" identifies the kind of conduct tied to interstate activity for which the federal statute makes it illegal to pay. The gravamen of a federal murder-for-hire prosecution under § 1958(a) is the violation of federal law, not state law.

Additionally, the text of § 1958(a) does not require varying state-law defenses to murder to apply in federal murder-for-hire prosecutions. "[I]n the absence of a plain indication of an intent to incorporate diverse state laws into a federal criminal statute, the meaning of the federal statute should not be dependent on state law." *United States v. Turley*, 352 U.S. 407, 411 (1957). The longstanding interpretation of materially similar statutory text in § 1952, as set forth by *Nardello* and our predecessor Court, has been that Congress did not intend that text to incorporate diverse state laws. *See Nardello*, 393 U.S. at 294-95; *Conway*, 507 F.2d at 1051-52; *Prince*, 515 F.2d at 566.

Here, the district court instructed the jury that "[m]urder is the unlawful, premeditated killing of a human being with malice aforethought and is a violation of the laws of the State of Florida." This instruction was an accurate description of the term murder, "a commonly used and understood word," *see Conway*, 507 F.2d at 1051, which Florida law proscribes, *see* Fla. Stat. § 782.04(1)(a)(1)

(stating first-degree murder is "[t]he unlawful killing of a human being . . . [w]hen perpetrated from a premeditated design to effect the death of the person killed"). The district court was not required to go further and instruct the jury on Florida's defenses to murder.

We recognize that Florida law generally requires a jury be instructed on these defenses in all murder trials. *See Pena v. State*, 901 So. 2d 781, 786-88 (Fla. 2005). That is because under Florida law (1) manslaughter is a required lesser included offense of first-degree murder, meaning it must appear on the jury verdict form, *see Daugherty v. State*, 211 So. 3d 29, 37 (Fla. 2017); (2) manslaughter is defined as "[t]he killing of a human being . . . without lawful justification . . . and in cases in which such killing shall not be excusable homicide or murder," *see* Fla. Stat. § 782.07(1); and (3) manslaughter, thus, can be defined fully only by the exclusion of justifiable and excusable homicide and the justifiable use of deadly force, *see Pena*, 901 So. 2d at 786-87; *Howard v. Moore*, 730 So. 2d 800, 801 (Fla. Dist. Ct. App. 1999). But, again, there is no text in § 1958 requiring that a person be charged and convicted under state law, so it follows that Florida's general rule requiring these instructions in a *Florida* murder trial does not apply to a *federal* prosecution under § 1958.

## D.    Harmless Error

As an independent, alternative holding, we conclude that any error in failing to instruct on Florida's defenses to murder was harmless in this case. Given the trial evidence, no reasonable jury

23-10272                Opinion of the Court                28

could have concluded Buselli's conduct constituted justifiable or excusable homicide or the justifiable use of deadly force under Florida law.

We can quickly dispense with justifiable and excusable homicide. For justifiable homicide to apply, the defendant must kill another while resisting an attempted murder or a forcible felony against the defendant. *See* Fla. Std. Jury Instr. (Crim) 7.1; Fla. Stat § 782.02. By contrast, excusable homicide applies only to accidental killings or killings by misfortune. *See* Fla. Std. Jury Instr. (Crim) 7.1; Fla. Stat. § 782.03.

There was no evidence presented at trial that Buselli sought Colon or "Paul" to kill Bradley in an effort to defend Buselli herself from an attempted murder or from a forcible felony by Bradley, or to have Bradley killed by accident or misfortune.

As to the justifiable use of deadly force, we recognize Buselli argues that this defense extends to the protection of others, such as Bradley's purported abuse of her daughter, and that the FBI interrogation tape presented at trial referenced this purported abuse.

But the use of deadly force in defense of another is justifiable under Florida law only when protecting another from "the *imminent* commission of a forcible felony." *See* Fla. Stat. § 776.012(2) (emphasis added); Fla. Std. Jury Instr. (Crim) 3.6(f). An "imminent" forcible felony is one that is "ready to take place: happening soon" and "requires no further measures to manifest." *See State v. Woodson*, 349 So. 3d 510, 511 (Fla. Dist. Ct. App. 2022).

"In other words, very little time or preparation may stand between the present moment and an 'imminent' event." *Id.* at 512; *see also State v. Wagner*, 353 So. 3d 94, 101 (Fla. Dist. Ct. App. 2022) (holding the defendant's use of deadly force was not justified where she left her house, walked to a neighbor's house, and returned a short while later to shoot her husband).

The steps Buselli took to arrange for Bradley's killing, including her months-long coordination with Colon and "Paul," belie any suggestion that she intended to prevent an "imminent" forcible felony against her daughter. Notably too, the crime of murder-for-hire under § 1958(a) is completed "once the defendant uses an instrument of interstate commerce with the intent that a murder-for-hire be committed." *Preacher*, 631 F.3d at 1203-04 ("The first time that Preacher used his cell phone to communicate his desire that the victim be killed for money, he violated § 1958."). Buselli completed the crime of murder-for-hire on at least the dates of July 9, 2021, and August 26, 2021, when she called Colon and "Paul" and offered to pay them to kill Bradley. *See id.* There is no evidence that Bradley's purported abuse of his daughter was "imminent" on those dates.

We also recognize that Buselli relies on the Supreme Court's decision in *Ruan v. United States*, 597 U.S. 450 (2022), and argues that the Florida defenses to murder were required for the jury to separate wrongful from innocent acts. *Ruan*, however, recognized that harmless error review would apply to the incorrect jury instructions in that case, and the Supreme Court declined to

determine in the first instance whether the incorrect instructions were harmless. *Id.* at 467. By contrast, for the reasons outlined above, we conclude readily that any error in the omission of instructions on Florida's defenses to murder was harmless because no reasonable jury would have found Buselli's conduct constituted justifiable or excusable homicide or the justifiable use of deadly force.

Even assuming the district court erred by failing to give the defense instructions, we have no "reasonable doubt that the jury would have reached the same result with or without" instructions on these defenses. *See Drury*, 396 F.3d at 1314. We therefore affirm Buselli's murder-for-hire conviction.

## V.    FALSE-STATEMENTS: CONSTITUTIONALITY AND JURY INSTRUCTIONS

Buselli was also charged and convicted of making false statements in violation of 18 U.S.C. § 1001(a)(2). Section 1001(a)(2) provides that an individual who, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined under this title [and] imprisoned not more than 5 years . . . ." 18 U.S.C. § 1001(a)(2). Other subsections of § 1001 limit the statute's application to certain matters within the jurisdiction of the judicial and legislative branches. *See id.* § 1001(b), (c). The statute does not limit its

23-10272               Opinion of the Court                    31

application to matters within the jurisdiction of the executive branch, such as interrogations by federal agents. *See id.* § 1001.

On appeal, Buselli challenges the constitutionality of her false-statements conviction and the district court's instructions on her false-statements charge. Because Buselli did not raise these challenges below, our review is for plain error. *See Hughes*, 840 F.3d at 1384.

First, Buselli argues that her false-statements conviction is unconstitutional under the Sixth Amendment because her statements were an assertion of her rights to plead not guilty and to demand a jury trial. Again, the statements underlying Buselli's conviction were "I would never ask anyone to do something like this" and "I don't want something to happen to him," referring to the murder-for-hire plot.

Buselli made these statements to an FBI agent after she was advised of her *Miranda* rights, including the right to remain silent, and warned further that it was a crime to lie to a federal agent.

We doubt whether Buselli's statements—after she was Mirandized and told lying to a federal agent was a crime—were akin to pleading not guilty or demanding a jury trial under the Sixth Amendment. Regardless, (1) the explicit text of § 1001 does not touch or address this issue, and (2) the parties have cited no decision from the Supreme Court or our Court directly resolving this issue, and we have found none. *See* 18 U.S.C. § 1001; *Duldulao*, 87 F.4th at 1252. As a result, we discern no plain error.

Second, Buselli challenges the instruction that an element of her false-statements charge was that she acted "willfully, knowing the statement was false." Buselli argues that § 1001(a) required the government to prove that she both "knowingly" *and* "willfully" made a materially false statement. Buselli argues the instruction quoted above improperly conflated the terms "willfully" and "knowingly," thereby relieving the government of proving an element of her § 1001(a) charge.

Here, there was no error, let alone plain error, in the district court's instruction on the elements of Buselli's false-statements charge. As Buselli concedes, the district court properly gave a definition of "willfully" and then a separate definition of "knowingly," all before setting out the elements of her false-statements charge. There is a strong, "almost invariable," presumption that juries follow instructions given by the district court. *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993) (quotation marks omitted); *United States v. Grushko*, 50 F.4th 1, 14 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 2594 (2023). We therefore presume the jury followed the district court's instruction on the meaning of "willfully"—as a term distinct from "knowingly"—and correctly understood those separate meanings in analyzing whether she willfully and knowingly made false statements to a federal agent.

Accordingly, the district court did not err, plainly or otherwise, in instructing the jury on Buselli's false-statements

conviction.    We therefore affirm Buselli's false-statements conviction.

### VI.    CONCLUSION

For the reasons above, we affirm Buselli's murder-for-hire and false-statements convictions.

**AFFIRMED.**