**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10131

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JASON STARR,
DARIN STARR,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 1:21-cr-00500-RAH-CWB-1

_____

———————————————

No. 24-11499

———————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JASON STARR,
DARIN STARR,

*Defendants-Appellants.*

———————————————

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 1:21-cr-00500-RAH-CWB-1

———————————————

Before JORDAN, NEWSOM, Circuit Judges, and HONEYWELL,* District Judge.

NEWSOM, Circuit Judge:

Jason Starr hired his brother, Darin Starr, to travel from Texas to Alabama to murder Jason's ex-wife, Sara Starr. A jury convicted Jason and Darin of one count of using interstate commerce facilities in the commission of a murder-for-hire, in violation of 18 U.S.C. § 1958, and the district court sentenced both to

———————————————

* Honorable Charlene E. Honeywell, United States District Judge for the Middle District of Florida, sitting by designation.

mandatory life imprisonment. The brothers now ask us to acquit them or, failing that, to vacate their convictions and sentences. They advance four grounds on appeal—chief among them whether the district court violated their right to present a complete defense. The Starrs also challenge two evidentiary rulings and the sufficiency of the evidence to support their convictions. After carefully considering the issues, and with the benefit of oral argument, we reject their contentions and affirm their convictions.

## I

### A

Let's begin with Jason. After Jason and Sara Starr went through a contentious divorce, Jason was required by their divorce decree to pay Sara about $3,500 each month, or 52% of his net income, toward things like child and spousal support. The agreement also required Jason to pay for Sara's health-insurance premiums, maintain a life-insurance policy on her behalf, and pay her $10,000 for equity in their marital home. The decree also entitled Sara to about $55,000 of Jason's inheritance from his grandmother's estate.

Jason was seemingly incensed. He expressed his frustration with his spousal-support obligation, in particular. In a document that he saved on his laptop in connection with a "book" he was writing, Jason wrote the following:

> If it is considered a job for a woman to stay home and they leave their marriage, then they should be treated like anyone losing a job. Give them their last

4                    Opinion of the Court                    24-10131

> paycheck and turn in everything the company bought for them . . . . They should not get health coverage.

Trial Tr. vol. 2, 42–43.  He continued:

> If I am made to pay her every month for the rest of my life for the support-based things she brought to the marriage, then what is she going to be required to give me for the rest of my life?  Is she going to come clean my house?  Mow my lawn?  Give me a blow job?
>
> What the fuck is she going to be required to pay for the rest of her miserable, fucking, lying life for putting my life on the line so she could eat and have clothes and shelter over her lying, cheating, cocksucking head?

*Id.* at 43.

After the divorce, with the help of her friend Lawrence Leuci, Sara secretly moved out of her marital home to a nearby church parsonage.  The same day, after the move, Jason stopped by her new residence unannounced.  Leuci testified that when Sara saw Jason, she "was absolutely terrified beyond anything I had ever seen before." *Id.* at 212.  "She turned pale . . . . [S]he could barely stand.  She was shaking." *Id.*  Jason tried to enter the parsonage, saying he had come by to "see if any of his stuff was in there."  Leuci turned him away, but when Jason left, Sara was still "[s]haking, crying, not able to really say much.  Just completely broke down." *Id.* at 214.  "[T]he second he arrived," and then "immediately" after he

left—just five minutes later—Sara said to Leuci, "He's going to kill me." *Id.* at 214–15, 223.

One more thing about Jason: There were troubling signs even before the divorce was finalized. Jason had earlier suggested murder as a solution for his friend Christopher Riley's divorce issues. In a tone that Riley described as "kidding but not kidding," Jason told him that "he knows somebody that can take care of your problems for two to $3,000." *Id.* at 243–44. That "somebody" was his brother Darin.

*    *    *

So, Darin. Two months before Sara's death, Darin bought a used Triumph motorcycle from Lilani Mahler for $300. While Darin initially paid Mahler a $40 deposit, Jason later paid her the remaining $260 through an online money-transfer service, Zelle.

Even after paying for Darin's motorcycle, Jason continued to use Mahler as a financial intermediary of sorts to send Darin money. Through Mahler's Zelle, Jason sent Darin an additional $2,600 in seven installments. Jason captioned the payments with seemingly innocuous descriptions, such as: "Darin, tire maintenance"; "Jason Starr, clutch"; "Jason Starr, Darin, tickets"; and "Jason Starr, Darin, Phoenix."

Mahler testified that this last payment, for "Phoenix," was meant to fund Darin's trip to visit his son in Phoenix, Arizona. The next day, though, Darin actually started traveling *eastward* from

6                          Opinion of the Court                          24-10131

Texas.  According to cell-site data,[1] Darin's phone moved from a location "west of San Antonio," Texas to Coffee County, Alabama—where Sara was living—over the next two days.  Gov't Ex. 7 at 10, Dkt. No. 167–23

The evening Darin arrived in Coffee County, a neighbor saw something unusual while letting his dogs out—a "heav[y] cruiser style bike" parked outside facing Sara's residence.  Someone cranked the bike and drove away at "around eight, 8:30 p.m."  This was so unusual that the neighbor called Sara to tell her about it.

Around the same time, at 7:56 p.m., Darin and Jason shared the following exchange over text:

> Darin:  I've been here at the deer stand for over an hour no show no deer know though I must pass out and dehydration I don't know what to do now
>
> Darin:  I know delete !!!
>
> Jason:  I think you sent this to the wrong person Maybe go get water, hahahaha
>
> Darin:  Your right, wrong person. I sorry
>
> Jason: Hahahaha. Love you brother!

Gov't Ex. 24 at 1, Dkt. No. 167–58.

---

[1] Cell-site data show a cellphone's general location at a certain point in time by identifying the location of the closest cellphone tower when the phone makes or receives a call.

In the following days, cell-site data show that Darin was near Sara's residence almost every day until her murder.

\*        \*        \*

A little more than a week after Darin arrived in Coffee County, a neighbor heard two gunshots in rapid succession shortly after 6:40 a.m., coming from the direction of the church.  Video footage from a camera on a barn close to Sara's home shows a motorcycle passing by a few minutes later, at 6:49 a.m.  A coworker, who went to check on Sara at around 8:25 a.m. after she didn't show up to work, found her dead body in the carport beside her home.  Sara had been shot twice by a shotgun, first in the chest and then in the head.  Cell-site data indicate that by 8:31 a.m. Darin had begun traveling west away from Coffee County.  He reached San Antonio shortly after midnight.

At the time of Sara's death, Jason was having breakfast at a local restaurant.  But the police, aware of the couple's contentious divorce, immediately identified him as a suspect.

The following spring, police arrested Darin for an unrelated offense—stealing a (different) motorcycle—in Texas.  While in custody, Darin called his mother and insisted, "I can't tell you why or what for, but Jason has the money for me and he can get me out." Gov't Ex. 16, Jan. 13, 2018 Jail Call at 3:29–3:38, Dkt. No. 167–37.  In subsequent calls from jail, he told other people, "My little brother owes me," id., June 30, 2020 Jail Call at 3:28–3:31, and Jason "owes me a big favor," id., July 5, 2020 Jail Call at 11:10–15.

## B

A federal grand jury charged Jason and Darin Starr with using interstate commerce facilities in the commission of a murder-for-hire, in violation of 18 U.S.C. § 1958.  The indictment alleged that Jason had paid Darin—with a Triumph motorcycle and money—to murder Sara.  The jury convicted Jason and Darin, and the court imposed the corresponding mandatory sentence of life imprisonment.

## II

On appeal, the Starrs raise four issues, which we will address in turn.

## A

The first question is whether the district court infringed the Starrs' right to present a complete defense by preventing them from introducing evidence of an alternate perpetrator.  The Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).  This is "[i]mplicit in a criminal defendant's constitutional rights under the Fifth and Sixth Amendments." *United States v. Machado*, 886 F.3d 1070, 1085 (11th Cir. 2018).  We review de novo whether the exclusion of evidence violated a constitutional right.  *United States v. Ifediba*, 46 F.4th 1225, 1237 (11th Cir. 2022).

Under "well-established rules of evidence," "trial judges [can] exclude evidence if its probative value is outweighed by

certain other factors such as unfair prejudice, confusion of the is-sues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326 (cit-ing Fed. R. Evid. 403). As relevant here, a judge may exclude a defendant's evidence regarding an alternate perpetrator if it "does not sufficiently connect the other person to the crime." *Id.* at 327. For example, such evidence may be excluded where it is merely "speculative or remote," or where it does "not tend to prove or disprove a material fact in issue at the defendant's trial." *Id.* (quot-ing 40A Am. Jur. 2d *Homicide* § 286 (1999)). At the least, there must be "some showing of a nexus between the [alternate perpetrator] and the particular crime with which a defendant is charged." *Cikora v. Dugger*, 840 F.2d 893, 898 (11th Cir. 1988).

At trial, the Starrs sought to introduce evidence of an alter-nate perpetrator—a man named Leonard Michalski. Their argu-ment rested on the grounds that Michalski and Sara had an "unset-tling" encounter at a Wal-Mart nine days before Sara's death; that Michalski told Jason that Jason would be the prime suspect if some-thing happened to Sara; and that Michalski later denied any in-volvement in Sara's murder in a suicide note. Further, the brothers said, Michalski owned both a Harley Davidson motorcycle—which they say could have been the "heav[y] cruiser style bike" seen by Sara's neighbor—and a car that looked "similar" to one seen on video near Sara's residence the morning she died. The government filed a motion in limine to exclude the evidence about Michalski, which the district court granted.

We agree with the district court's decision to exclude the Michalski-related evidence. The court found that Michalski couldn't have been the shooter because, as confirmed by multiple eyewitness accounts, he "was either preparing for or was piloting an Army helicopter at Fort Novosol at the time of the murder." Order Granting Mot. in Lim. 1–2, Dkt. No. 152. And the Starrs have "point[ed] to no evidence, and ma[de] no argument, that implicates Michalski as the shooter or triggerman." *Id.*

And though the Starrs suggest that Michalski could have hired *someone else* to murder Sara, they still haven't "present[ed] any evidence or argument of who that person actually is, or how that person became involved, or how Michalski is connected to that person, or what motive that person had to kill Sara." *Id.* at 3. When asked who Michalski could have hired, defense counsel responded, "Well, your Honor, I think only Leonard Michalski could answer that question." Mot. in Lim. Hr'g Tr. 28, Dkt. No. 245.

To be sure, Michalski seems to have had a complicated relationship with Sara. But that's not enough to show a "nexus" between Michalski and her murder. *See Cikora*, 840 F.2d at 898. In the absence of something more concrete, the Starrs' suggestion of Michalski as an alternate perpetrator is too speculative to connect him to Sara's death. *See Holmes*, 547 U.S. at 327. If admitted, the evidence's risk of misleading the jury or confusing the issues by overemphasizing Michalski's involvement would have outweighed its probative value. Thus, under Rule 403, the district

24-10131                Opinion of the Court                11

court correctly excluded the Starrs' evidence of an alternate perpetrator.

**B**

The second question is whether the district court abused its discretion in admitting two pieces of evidence. First, the court held that Sara's statement to Lawrence Leuci, "He's going to kill me," fit within the excited-utterance exception to the hearsay rule. Second, the district court held that FBI Agent Donald VanHoose's testimony recounting statements of individuals whom he and other law-enforcement officials had interviewed was admissible not for its truth but, rather, to demonstrate the interviewees' statements' "effect on the listener"—in particular, to explain how they affected the course of his investigation.

"We review evidentiary rulings for an abuse of discretion." *United States v. Thomas*, 242 F.3d 1028, 1031 (11th Cir. 2001).

**1**

Hearsay refers to an out-of-court statement offered "to prove the truth of the matter asserted" and is generally inadmissible unless it falls within an exception. Fed. R. Evid. 801(c). An excited utterance, which is admissible under a hearsay exception, is a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). Because "such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation," an excited utterance "is trustworthy

and . . . cross-examination would be superfluous." *Idaho v. Wright*, 497 U.S. 805, 820 (1990).

We have recognized that "[w]hile the declarant must still be under the stress or excitement that the startling event caused, the excited utterance need not be made contemporaneously to the startling event." *United States v. Belfast*, 611 F.3d 783, 817 (11th Cir. 2010). "It is the totality of the circumstances, not simply the length of time that has passed between the event and the statement, that determines whether a hearsay statement was an excited utterance." *Id.*

According to Leuci, when Jason stopped by Sara's new home unannounced, she "was absolutely terrified beyond anything [he] had ever seen before." Trial Tr. vol. 2, 212. "She turned pale . . . . [S]he could barely stand. She was shaking." *Id.* And when Jason left five minutes later, she was still "[s]haking, crying, not able to really say much" and "[j]ust completely broke down." *Id.* at 214. "[T]he second he arrived," and then "immediately" after he left, Sara said to Leuci, "He's going to kill me." *Id.* at 214–15, 224.

The Starrs objected to the admission of Sara's statement, "He's going to kill me," on hearsay grounds. But the statement was related to Jason's visit, and Sara's visible distress makes clear that she made her statement while under the stress of excitement caused by his sudden appearance. Accordingly, the statement qualifies as an excited utterance. Further, the immediacy of her statement—the moment he arrived and again moments after he left—

mitigates the possibility that the passage of time had muted her distress. *See Belfast*, 611 F.3d at 817–18 (holding that a declarant's statement made "four to five hours" after an assault constituted an excited utterance). The district court didn't abuse its discretion in admitting Sara's statement.

**2**

An out-of-court statement offered to show its effect on the listener isn't hearsay because it's not offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Accordingly, it's admissible without needing to fit within an exception. *See United States v. Mateos*, 623 F.3d 1350, 1364 (11th Cir. 2010).

Agent VanHoose provided testimony explaining how information he learned from people interviewed by law-enforcement officials—*i.e.*, from out-of-court statements—affected the course of his investigation. This prompted the Starrs, once again, to raise a hearsay objection. But the district court admitted VanHoose's testimony, concluding that the statements were offered for their effect on the listener, not to prove the truth of the matter asserted. We agree with the district court.

The prosecutor specifically asked VanHoose to testify in the following format in order to confine his testimony to the interviews' effect on his investigation and to avoid running afoul of the hearsay prohibition: "I learned this fact, which made me do the next thing." Trial Tr. vol. 2, 115. And that's exactly what VanHoose did. For example:

14                      Opinion of the Court                    24-10131

- From the county police's interviews with Jason's children, VanHoose learned that Darin was in Alabama for Thanksgiving.  That led VanHoose to speak to Mary Starr, Jason and Darin's mother.

- From speaking to Mary, VanHoose learned that Darin had arrived in Alabama on a motorcycle for Thanksgiving.  Knowing that a motorcycle had passed by Sara's residence minutes after the murder, VanHoose began to investigate Darin.

- From the FBI's interview of Mahler, VanHoose learned that she had sold the motorcycle to Darin.  That led VanHoose to use forensic accounting and to subpoena Jason's bank records to determine how Darin had paid for the motorcycle.

Further, the district court took appropriate steps to mitigate any risk that the jury would consider VanHoose's testimony for improper purposes.  First, the court cautioned the government "to be careful in how [it] phrase[d its] questions." *Id.* at 112.  Second, the court gave the jury a limiting instruction.  The court told jurors to use those out-of-court statements only "for the limited purpose of [showing] their effect on law enforcement's investigation." Trial Tr. vol. 6, 86.  Continuing, the court clarified that "the statements were not offered for the truth of the matter asserted, and as such, you cannot accept those statements made to law enforcement as the truth." *Id.*  We have previously held that an instruction directing jurors "to consider the testimony only for the effect it had on

the listeners" "reduced the risk that the jury would improperly consider th[e] out-of-court statement for the truth of the matter asserted." *United States v. Kent*, 93 F.4th 1213, 1220 (11th Cir. 2024). In light of the cautionary warning to the government and the limiting instruction, we conclude that the district court sufficiently reduced any risk that the jury would consider VanHoose's testimony for improper purposes.

## C

The third and final question is whether there is sufficient evidence to convict the Starrs. We review de novo challenges to the sufficiency of the evidence. *United States v. Trujillo*, 146 F.3d 838, 845 (11th Cir. 1998). "[E]vidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We draw "all reasonable inferences and credibility choices in the Government's favor." *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007). Our review "requires only that a guilty verdict be reasonable, not inevitable, based on the evidence presented at trial." *Id.*

The elements of murder-for-hire under 18 U.S.C. § 1958(a), are (1) "traveling in or causing another to travel in interstate or foreign commerce," (2) "with intent that a murder be committed in violation of the laws of any State or the United States," (3) "in return for a promise or agreement to pay anything of pecuniary

value." *United States v. Buselli*, 106 F.4th 1273, 1282–83 (11th Cir. 2024) (citation modified); *see* 18 U.S.C. § 1958(a). There is sufficient evidence for a reasonable juror to find the elements of murder-for-hire beyond a reasonable doubt here—*i.e.*, that Jason had caused Darin to travel in interstate commerce (from Texas to Alabama) to murder Sara, by paying him $2,600 and buying him a motorcycle.

To start, the evidence is sufficient to prove Jason's intent to have Sara murdered. After their contentious divorce, he was frustrated about spending half his monthly income to pay for child and spousal support and for her health insurance, as well as having to share the equity in their marital home. The vulgar notes on his laptop make clear his resentment toward having to pay spousal support, in particular: "[W]hat is she going to be required to give me for the rest of my life? Is she going to come clean my house? Mow my lawn? Give me a blow job?" Trial Tr. vol. 2, 42–43.

And Jason appeared to consider murder a solution to marital problems, having told his also-divorced friend Riley that "he knows somebody that can take care of your problems for two to $3,000." *Id*. at 243–44. In the end, Jason took his own advice; he paid a total of $2,860—$260 for Darin's motorcycle and another $2,600 via Zelle. Hot on the heels of Jason's last payment, Darin rode to Alabama to kill Sara.

For Darin's part, we know that the timing of Darin's arrival in Coffee County coincided with surveillance footage of a "cruiser style" motorcycle seen near Sara's residence; that Darin's cellphone was close to Sara's residence almost every day until her murder;

24-10131                Opinion of the Court                17

that Darin exchanged suspicious texts with Jason (announcing his presence at a "deer stand," followed by "I know delete !!!"); that video footage shows a motorcycle passing by Sara's home shortly after she was murdered; and that Jason owed him for a "big favor" that he couldn't disclose. Thus, even though there is no "smoking gun,"[2] there is sufficient evidence to find that Darin had murdered Sara at Jason's behest.

To be sure, the Starrs offer a few alternative explanations for the evidence against them. Their strongest arguments are that Jason's Zelle payments were for motorcycle repairs, not murder; that Darin went to Coffee County to visit his mother for Thanksgiving, not to kill Sara; and that Darin was actually at a real "deer stand," instead of near Sara's home, on the night he texted Jason.

But in a sufficiency-of-the-evidence challenge, we must "consider the evidence in the light most favorable to the Government" and draw "all reasonable inferences" in its favor. *Browne*, 505 F.3d at 1253. Alternative explanations can't overcome the verdict so long as a reasonable juror could find from the evidence that the Starrs are guilty beyond a reasonable doubt. Because we conclude that the evidence is sufficient to convict the Starrs, we needn't weigh the merits of their alternative explanations individually.

---

[2] This case relies on circumstantial evidence, which is "intrinsically no different from testimonial evidence" in criminal cases. *Holland v. United States*, 348 U.S. 121, 140, (1954). We evaluate circumstantial evidence and direct evidence identically. *See United States v. Henderson*, 693 F.2d 1028, 1030 (11th Cir. 1982).

### III

To recap, we hold (1) that the district court did not infringe the Starrs' right to present a complete defense by disallowing them from introducing speculative evidence that Michalski was the real perpetrator; (2)(a) that the court did not abuse its discretion in admitting Sara's statement as an excited utterance; (2)(b) that the court did not abuse its discretion in admitting VanHoose's testimony for the effect on the listener; and (3) that the evidence is sufficient for a reasonable jury to find the Starrs guilty beyond a reasonable doubt.

**AFFIRMED**.

24-10131               JORDAN, J., Concurring                    1

JORDAN, Circuit Judge, concurring:

I join Judge Newsom's opinion for the court in full, and write separately to note my doubts about the Supreme Court's standard for evaluating whether the exclusion of so-called third-party perpetrator evidence in a criminal case violates the constitutional guarantee of the opportunity to present a complete defense.

As our opinion today explains, the Supreme Court has said that a trial court can exclude a defendant's evidence regarding a third-party perpetrator if that evidence "does not sufficiently connect the other person to the crime." *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006) (citation omitted). For example, such evidence can be excluded where it is "speculative or remote," or where it "does not tend to prove or disprove a material fact in issue at the defendant's trial." *Id.* (citation omitted).

This standard seems incorrect to me. In our criminal justice system, a defendant does not have the burden to prove his innocence. The government instead has the burden to prove guilt beyond a reasonable doubt. If the defendant has any task during a trial, it is to create reasonable doubt—a doubt which is actual and substantial as opposed to merely possible, fanciful, or conjectural, or which would cause a reasonable person to hesitate to act. *See Victor v. Nebraska*, 511 U.S. 1, 20 (1994).

Given the Supreme Court's language in *Holmes*, I agree that the district court did not err in excluding the third-party perpetrator evidence relating to Leonard Michalski. But if I were writing on a clean slate, I might reach a different conclusion. In my view,

the fact that the defendants—Jason and Darin Starr—were unable to identify Mr. Michalski's alleged accomplice in the murder should not have necessarily resulted in the exclusion of the evidence and, therefore, may have denied them the ability to present their theory of defense. Because an alleged third-party perpetrator "is not on trial, the evidence proffered need not 'prove or even raise a strong probability that a person other than the defendant committed the offense' so long as it 'tend[s] to create a reasonable doubt' as to the defendant's guilt." *United States v. Moore*, 590 F. Supp. 3d 277, 283 (D.D.C. 2022) (citations omitted). The use of an accomplice by Mr. Michalski here was not a far-fetched theory. Indeed, the government's own case against the Starrs was based on the theory that Jason used an accomplice, Darin, to commit the murder. *Cf. United States v. Taglione*, 546 F.2d 194, 198 (5th Cir. 1977) ("All this does not raise an open and shut defense, but it does raise a theory of defense which the defendant was entitled to have considered. Where the evidence presents a theory of defense for which there is foundation in the evidence, refusal to charge on that defense is reversible error.") (paragraph structure altered) (citation omitted).

One of the Supreme Court's 19th century cases explains that third-party perpetrator evidence can be excluded if it is "so remote or insignificant as to have no legitimate tendency to show that [the third party] *could have committed* the murder," *Alexander v. United States*, 138 U.S. 353, 356 (1891) (emphasis added), and to my mind this is a more correct statement of what the standard should be. So, if the "time and the circumstances attending the murder were uncertain or obscure, the conduct and threats of [the third party]

24-10131　　　　　　　　JORDAN, J., Concurring　　　　　　　　3

might have a material bearing upon the identification of the murderer." *Id.* at 357.

Another possible way to frame the standard is to use probable cause as the barometer: "If the evidence proffered by the defendant would permit the state to proceed with a criminal prosecution against the third party, then the defendant must be permitted to tell the story of third party guilt." John H. Blume, Sheri L. Johnson, & Emily C. Paavola, *Every Juror Wants a Story: Narrative Relevance, Third Party Guilt, and the Right to Present a Defense*, 44 Am. Crim. L. Rev. 1069, 1070 (2007). Importantly, probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," and it is "not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2013) (internal quotation marks and citations omitted).